## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| NORTHBELT, LLC, | § | **CASE NO. 19-30388** |
| | § | **Chapter 11** |
| Debtor. | § | |

### SECURED LENDER'S OBJECTION
### TO DEBTOR'S FIRST AMENDED CHAPTER 11 PLAN

Wilmington Trust, N.A., as Trustee for Morgan Stanley Bank of America Merrill Lynch Trust 2014-C19, Commercial Mortgage Pass Through Certificates, Series 2014-C19 (the "**Secured Lender**"), hereby objects (this "**Objection**") to confirmation of the *Debtor's First Amended Chapter 11 Plan of Reorganization* [Docket No. 88] (the "**Plan**")[1] on the grounds that the Plan was not filed in good faith and is not feasible.

### Preliminary Statement

1.      Using a range of assumptions favorable to Debtor, the Plan requires a minimum financial contribution of $200,000 for the first twelve (12) months.  The only proposed source of this money is the Reorganized Debtor's revenues. To cover Plan payments and operating expenses, the Reorganized Debtor must receive minimum monthly rent proceeds of $301,766. **There is not a single schedule, operating report, financial statement, rent roll, or projection filed in this case that supports a figure that large**. Simply stated, the Plan is not feasible and the Court should not confirm it.

---

[1] Capitalized terms not defined herein shall have the meanings set forth in the Plan, or if not defined therein, in the Loan Documents.

**Background**

**A. Secured Lender's Claim**

2.     Secured Lender is the holder by assignment from Bank of America, N.A. ("**Original Lender**") of that certain loan (the "**Loan**") evidenced by the following document, each dated as of September 19, 2014: (i) that certain Promissory Note in the original principal amount of $13,500,000 executed and delivered by Northbelt, LLC (the "**Debtor**") to Original Lender, (ii) that certain Loan Agreement (the "**Loan Agreement**")by and between Debtor and Original Lender, and (iii) that certain Deed of Trust, Assignment of Leases and Rents, and Security Agreement (the "**Deed of Trust**") executed and delivered by Debtor to the trustee named therein for the benefit of Original Lender. The foregoing documents, together with all other documents evidencing and/or securing Loan are collectively referred to as the "**Loan Documents**."

3.     The current non-default, monthly payment due on the Loan is $128,604.51 (inclusive of principal, interest, reserves and tax and insurance escrow).

4.     Prior to the Petition Date, several Events of Default (as defined in the Loan Documents) had occurred and were continuing, and Secured Lender had accelerated the indebtedness evidenced by the Loan Documents prior to the Petition Date.  The Claim (defined below) specifies with particularity the monetary and non-monetary defaults that had occurred and were continuing under the Loan Documents as of the Petition Date (the "**Defaults**").

5.     On June 11, 2019, Secured Lender filed a proof of claim, registered as Claim No. 5-1, evidencing a claim of not less than $15,385,325.53, secured by a first-position lien on the Debtor's real and personal property (the "**Claim**").

6.      Secured Lender's collateral consists primarily of a first lien on a commercial office building located at 333 N. Sam Houston Parkway in Houston, Texas (as more particularly described in the Deed of Trust, the **"Property"**) and an assignment of the commercial leases and rents derived from the Property.

7.      The Debtor values the Property at $19 million. *See* First Amended Disclosure Statement, § 4.01.  Consequently, based on Debtor's valuation, Secured Lender's claim is over-secured and has accrued post-petition interest and legal fees pursuant to section 506(b) of the Bankruptcy Code.

**B.  Proposed Treatment of Secured Lender's Claim under Plan**

8.      The Debtor disputes Secured Lender's claim of $15,385,325.53.  Specifically, the Debtor contends that none of the accrued interest, late charges, fees, and advances that the Secured Lender has made to cover taxes and insurance on the Property are recoverable, but Debtor has provided no legal basis for its contention.

9.      The Debtor further states that it has cured all non-monetary defaults on the Loan and has "kept current prior to and after the Chapter 11 filing."  *See* Disclosure Statement, p. 14. For these reasons, the Debtor asserts that it will be in full compliance with the Loan Documents at confirmation of the Plan without the need to make any monetary cure.  The Plan proposes to resume monthly payments to Secured Lender going forward at $128,604.51 per month.

10.     The Debtor has provided no evidence of its cure of the Defaults, and Secured Lender strongly disputes any allegations that the Defaults were cured prior to the Petition Date.

11.     The Debtor has not yet objected to Secured Lender's claim.  Secured Lender does not believe the Debtor will be successful in eliminating a material portion, if any, of the

outstanding interest, fees, charges, and escrow advances that have accrued on the Loan pursuant to the express terms of the Loan Documents.

12.     Secured Lender also disagrees that the Debtor has "kept current" on the Loan post-petition. Pursuant to this Court's orders approving the use of cash collateral on an interim and final basis, the Debtor agreed to and was ordered to deliver to Secured Lender excess cash net of operating expenses and U.S. Trustee fees on a monthly basis as adequate protection of Secured Lender's interest in its collateral. These monthly adequate protection payments, however, have never been paid to or received by Secured Lender.  As of the filing of this Objection, Secured Lender has received $0 in adequate protection payments.

13.     If the Debtor has accrued no excess cash from and after the Petition Date, there can be no reasonable expectation that Reorganized Debtor will have sufficient funds to (i) cover monthly payments (including escrow) at the contractual rate going forward, or (ii) to fund its obligations under the Plan.

14.     Accordingly, Secured Lender believes that the proposed treatment of its claim under the Plan is objectionable because, amongst other reasons, it is based on unreasonable and unsupportable assumptions, including the assumption that, at confirmation, the Debtor will neither pay any monetary cure, nor take action to cure the non-monetary defaults.

**C.  Proposed Treatment of Other Claims**

15.     In addition to Secured Lender's claim, various taxing authorities and trade creditors have filed liens against the Property totaling $782,387.92.  The Texas Comptroller of Public Accounts claims franchise taxes in the amount of $1,422.10, of which $1,172 is asserted as a priority claim.  *See* Claim No. 3-1.  The Debtor scheduled a $300,000 loan made by insider

Donald Testa (the "**Testa Loan**")[2] as a general unsecured claim.[3]  In addition to these secured, priority, and general unsecured claims, the Plan refers to both Administrative Claims and Professional Fee Administrative Claims, although neither the Plan nor the Disclosure Statement provide any estimate of the amount or other information concerning these claims.

16.     The Plan proposes to treat these various claims as follows:

| Class | Type | Treatment | Amount |
|---|---|---|---|
| Unclassified | Administrative Claims | Paid in full on or before Effective Date or in the ordinary course of business following the Effective Date. | Unknown. |
| Unclassified | Professional Fee Administrative Claims | Paid in full once allowed by a final order. | Unknown.[4] |
| Unclassified | Priority Claims | Paid over five (5) years at 12% interest per annum. | $1,172.00 |
| Class 1 | Allowed Secured Claims for Ad Valorem Taxing Authorities | Paid when due from funds escrowed with Wilmington Trust. | $0.00 |
| Class 2 | Allowed Secured Claim of Wilmington Trust (Secured Lender) | Ongoing monthly payment of $128,604.51<br><br>*this is the non-default amount and does not take into account the filed Claim | N/A |
| Class 3 | Allowed Secured Claims of Mechanics Lien Holders[5] | Paid in full over twelve (12) months from the confirmation date. | $782,387 |

[2]  The existence of the Testa Loan, standing alone, is an Event of Default under the Loan Documents.

[3]  The Debtor also scheduled a general unsecured claim of Primary Lending LLC in the amount of $400,000, but listed the debt as contingent, unliquidated, and disputed.  Because Primary Lending did not file a proof of claim, Secured Lender has not included this claim in its analysis of the Plan.

[4]  Debtor's counsel appears to have a retainer of $20,000 but it is unclear whether this will be sufficient to cover allowed professional fees.

[5]  The Debtor's use of the term "Mechanics Lien Holders" to describe the claimants in Class 3 is confusing because $360,812 of the $782,387 in claims were scheduled as tax debt.

303603938 v5

| Class 4 | Allowed General Unsecured Claims | Payed over forty-eight (48) months with 2% interest per annum. | $300,000* <br><br> *Assumes Primary Lending LLC claim is not allowed due to failure to file claim |
|---------|----------------------------------|----------------------------------------------------------------|------------------|
| Class 5 | Equity | Retained by Testa Family Limited Partnership | N/A |

17.     Setting aside the unknown nature of the Administrative Claims, and assuming solely for the purpose of this exercise and analysis that the Debtor (a) can successfully eliminate any monetary cure of Secured Lender's claim[6] and (b) will have sufficient funds on hand to satisfy ad valorem taxes and U.S. Trustee fees, the Plan will require the Reorganized Debtor to fund approximately $200,000 on a monthly basis to cover creditor payments.[7]

**D.  Plan Funding and Financial Projections**

18.     The Debtor proposes to fund the Plan from its continuing operations.  *See* Plan, § 2.02.  In order for the Plan to be feasible, the Reorganized Debtor will have to earn a sufficient amount of rental income from the Property to meet the proposed monthly Plan payment of $200,000 while also funding ongoing operations. The Financial Projections attached to the Disclosure Statement as Exhibits C1 and C2 forecast monthly expenses of $101,765.50[8] to run the Debtor's business post-confirmation.  Accordingly, **the Reorganized Debtor has to gross at least $301,766 per month to avoid defaulting under the Plan** within the first twelve (12) months following confirmation.

---

[6]  The Secured Lender does not consent to this treatment, does not believe the Debtor will be able to dispute Secured Lender's Claim, and does not waive its rights.

[7]  This sum is calculated by adding the proposed monthly payments to Secured Lender [$128,604], Class 3 secured claims [$65,198], and Class 4 general unsecured claims [$6,250].

[8]  This $101,765.50 forecasted mount is substantially less than any of the amounts listed in the Debtor's previously-filed monthly operating expense reports.

303603938 v5

19.     Because it is a single-purpose entity whose sole source of income are the rents derived from the Property, the Debtor's current register of paying tenants (a "rent roll") is critically important to evaluating whether it will be able to meet its Plan obligations and have sufficient liquidity to continue as a going concern.

20.     Secured Lender has reviewed several documents relevant to predicting whether the Debtor will be able to fund the Plan.  These documents contradict each other and grossly overstate the Debtor's projected income.  Moreover, even taken at face value, none project sufficient revenues to cover Plan payments, and thus the Plan is not feasible.

21.     The Debtor's most recent Monthly Operating Report filed on July 22, 2019 [Docket No. 95] shows that the Debtor's gross income peaked at $263,876 in February 2019, and has averaged $238,318 since January 2019.  This is insufficient to fund the Plan and maintain operations.

22.     The rent roll included with Exhibit B to the Disclosure Statement reports the tenant status as of March 1, 2019.  Although the rent roll purports to show that the Debtor will earn $252,139.30 per month in total rents, **nine (9) of the leases expired as of July 31, 2019** and an additional five (5) leases will expire at the end of the year.  According to this rent roll, only thirteen (13) tenants are under leases as of January 1, 2020, representing approximately $131,468 in potential revenue.  This is insufficient to fund the Plan and maintain operations.

23.     Secured Lender obtained an updated rent roll from the Debtor attached hereto as **Exhibit A.**  This document reports sixteen (16) tenants under lease as of June 30, 2019 with monthly rents totaling $139,227.  Two of these leases expire prior to the end of the year.  When these are excluded, the June 30th rent roll projects revenue of $127,483 going into 2020.  This is insufficient to fund the Plan and maintain operations.

303603938 v5

24.     It should be further noted that the March 1st and June 30th rent rolls contain wildly different rosters of tenants.[9]  Secured Lender cannot understand why the rent rolls are so dissimilar.  For example, Qualitec Technical Services, LP appears on the June 30th rent roll occupying five units for a total rent of $11,361 under leases that allegedly began on January 1, 2016.  But Qualitec does not appear on the March 1st rent roll.  By contrast, Holloman Corporation, the Debtor's "anchor tenant" for many years, appears on the March 1st rent roll but is conspicuously absent from the June 30th version.  The inconsistencies between these rent rolls render a meaningful projection of Debtor's financial future impossible.  Nevertheless, even if the Court were to use the highest income figures in any of these documents, the income is insufficient to fund the Plan and maintain ongoing operations.

## Objection

### A.     The Plan Has Not Been Proposed In Good Faith

25.     The Court may only confirm the Plan if it complies with the requirements of section 1129(a) of the Bankruptcy Code.  Among those requirements is that the Plan "has been proposed in good faith and not by any means forbidden by law."  *See* 11 U.S.C. § 1129(a)(3).  The "good faith" evaluation of a proposed plan takes in the totality of the circumstances surrounding the bankruptcy filing.  *See In re Cypresswood Land Partners, I*, 409 B.R. 396, 425 (Bankr. S.D. Tex. 2009).  "Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of section 1129(a)(3) is satisfied."  *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985).

26.     The circumstances of this case do not support a finding that the Debtor has acted in good faith.  This bankruptcy case is essentially a two party dispute between the Debtor and

---

[9]  Tenant, Consolidated Pipe & Supply is the only overlap.

Secured Lender.  There are few other creditors, and the Debtor's principal is the only general unsecured creditor (and the Plan proposes to pay this insider interest).  The Debtor filed bankruptcy to forestall a state court action that Secured Lender filed weeks earlier.  The Debtor's principal asset is Secured Lender's collateral.  The Debtor unreasonably asserts that there are no enforceable monetary defaults in the Loan Documents that it must cure prior to reinstating the Loan.  The Debtor's failure to make a serious proposal to address its defaults demonstrates a lack of good faith in dealing with its primary creditor.

27.    Furthermore the Debtor's financial projections are riddled with internal contradictions, are woefully under forecast, and fail to provide an accurate forecast of post-petition earning.  Even taken at face value, the Debtor's financial projections do not show sufficient income to fund the Plan, which consequently has no reasonable hope of success.  *See In re Sun Country Dev.*, 764 F.2d at 408.  The Debtor did not file this Plan in good faith and the Court should not confirm it.

**B.    The Plan is Not Feasible**

28.    Section 1129(a)(11) requires the Court to find that confirmation of the Plan "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . . unless such liquidation or reorganization is proposed in the plan."  Commonly known as the "feasibility" requirement, section 1129(a)(11) requires courts to determine whether a plan offers a "reasonable assurance of commercial viability."  *See In re Save Our Springs (S.O.S.) Alliance, Inc.*, 632 F.3d 168, 172 (5th Cir. 2011). When assessing feasibility, bankruptcy courts typically look at the debtor's capital structure and the earning power of the business, among other factors.  *See In re Geijsel*, 480 B.R. 238, 257 (Bankr. N.D. Tex. 2012).

303603938 v5

29.     As discussed above, using a range of assumptions favorable to Debtor, the Plan requires a minimum financial contribution of $200,000 for the first twelve (12) months.  The only proposed source of this money is the Reorganized Debtor's revenues.

30.     To cover Plan payments and operating expenses, the Reorganized Debtor must receive minimum monthly rent proceeds of $301,766.  **There is not a single schedule, operating report, financial statement, or projection filed in this case that supports a figure that large**.  *See id.* at 357 ("One way to assess the reliability and soundness of a debtor's projections is to use the period of the case as a test-run, and to see if the debtor has, indeed, been able to meet its projections.").

31.     Even if one were to accept the higher range of the Debtor's projections – monthly revenues of $250,000 – eighty per cent (80%) of that cash would be committed to the Plan.  *See In re Lakeside Glob. II, Ltd.*, 116 B.R. 499, 507 (Bankr. S.D. Tex. 1989) ("When virtually all the income generated from the property "is required to satisfy the debtor's obligation under the plan, it is difficult to conceive of how a plan could be feasible under the Code.").  Simply stated, the Plan is not feasible, and the Court should not confirm it.


WHEREFORE, Secured Lender respectfully requests that this Court (a) deny confirmation of the Plan and (b) grant Secured Lender such further relief as the Court deems appropriate.

303603938 v5

**DATED** this 5th day of August, 2019.

Respectfully submitted,

**K&L GATES LLP**

By:   */s/Liz Boydston*
Liz Boydston, SBN 24053684
liz.boydston@klgates.com
1000 Main Street, Suite 2550
Houston, Texas 77002
Tel: 713.815.7339
Fax: 713.815.7301

-and-

Christopher Fernandez, (*admitted pro hac vice*)
NC Bar No. 27818
chris.fernandez@klgates.com
214 N. Tryon Street
Charlotte, NC  28202
Phone: 704-331-7508
Fax: 704-331-7598
chris.fernandez@klgates.com

ATTORNEYS FOR THE SECURED CREDITOR, WILMINGTON TRUST, N.A., AS TRUSTEE FOR MORGAN STANLEY BANK OF AMERICA MERRILL LYNCH TRUST 2014-C19, COMMERCIAL MORTGAGE PASS THROUGH CERTIFICATES, SERIES 2014-C19

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 5, 2019, a true and correct copy of the foregoing document was served via the Court's electronic noticing system to all those who have consented to service and to Debtor's counsel via electronic mail.

*/s/Liz Boydston*

303603938 v5