IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| NORTHBELT, LLC, | § | CASE NO. 19-30388 |
| | § | Chapter 11 |
| Debtor. | § | |

SECURED LENDER'S RESPONSE
TO DEBTOR'S CLAIM OBJECTION

Wilmington Trust, National Association, as Trustee for Morgan Stanley Bank of America Merrill Lynch Trust 2014-C19, Commercial Mortgage Pass-Through Certificates, Series 2014-C19 (the "**Secured Lender**"), hereby responds to the *Debtor's Objection to Claim of Wilmington Trust, N.A., As Trustee for Morgan Stanley Bank of America Merrill Lynch Trust 2014-C19, Commercial Mortgage Pass Through Certificates, Series 2014-C19 (Claim No. 5)* (the "**Claim Objection**") as follows.

**Background**

**A. Secured Lender's Claim**

1.   Secured Lender is the holder by assignment from Bank of America, N.A. ("**Original Lender**") of that certain loan (the "**Loan**") evidenced by the following documents, each dated as of September 19, 2014: (i) that certain Promissory Note in the original principal amount of $13,500,000 executed and delivered by Northbelt, LLC (the "**Debtor**") to Original Lender, (ii) that certain Loan Agreement (the "**Loan Agreement**")[1] by and between Debtor and Original Lender, and (iii) that certain Deed of Trust, Assignment of Leases and Rents, and Security Agreement (the "**Deed of Trust**") executed and delivered by Debtor to the trustee named therein for the benefit of Original Lender.  *See* Declaration of Jonathan Stanton In

---
[1] Capitalized terms not defined herein shall have the meanings set forth in the Loan Agreement.

1

Support of Secured Lender's Response to Debtor's Claim Objection (the "<u>Stanton Declaration</u>" or "<u>Stanton Dec.</u>"), ¶ 3, attached hereto as **Exhibit A**.  The foregoing documents, together with all other documents evidencing and/or securing Loan are collectively referred to as the "<u>**Loan Documents**</u>."

2. On June 11, 2019, Secured Lender filed a proof of claim, registered as Claim No. 5-1, evidencing a claim of $15,385,325.53, secured by a first-position lien on Debtor's real and personal property (the "<u>**Claim**</u>").  True and accurate copies of the Loan Documents are attached to the Claim and incorporated herein by reference.

3. The Loan Documents are governed by the laws of the State of Texas.

**B. Debtor's Pre-Petition Defaults Under the Loan Documents**

4. Debtor is a single purpose entity, formed to own and manage a commercial office building located at 333 N. Sam Houston Parkway in Houston, Texas (as more particularly described in the Deed of Trust, the **"Property"**).  Debtor generates all of its revenue from commercial leases with tenants who occupy the Property.  Debtor has pledged the Property and its rental income to Secured Lender as security for the Loan.

5. At the time that Debtor entered into the Loan with Original Lender, the Holloman Corporation (**"Holloman"**) occupied a significant number of units at the Property.  The Lease Agreement between Debtor and Holloman dated as of March 27, 2007 (the **"Holloman Lease"**), was so important to Debtor's cash flow that the Loan Documents define several Holloman-related events that trigger certain obligations of the Debtor regarding cash management.  One such event, a "Holloman Renewal Event," occurs if Holloman fails to renew or extend the Holloman Lease on the same economic terms at least twelve (12) months prior to expiration of the current term.

6. A Holloman Renewal Event occurred on July 31, 2017, when Holloman failed to indicate that it would renew the Holloman Lease. Instead, Debtor agreed to give Holloman several months of occupancy at no charge and the parties subsequently entered into a new leasing arrangement. Holloman remains a tenant at the Property today, but it occupies far less space and, consequently, the Property produces less revenue than it did two years ago.

7. The Holloman Renewal Event commenced a **"Cash Sweep Period"** under the Loan Agreement. This required Debtor to deposit excess cash into an "Excess Cash Reserve Account" as additional security for the Loan. *See* Loan Agreement § 9.5.

8. The Cash Sweep Period also imposed certain controls on how Debtor accounted for and spent cash. At the beginning of a Cash Sweep Period, Debtor agreed to open a deposit account (the **"Deposit Account"**) and to instruct tenants to make rent payments directly into the Deposit Account for the benefit of Secured Lender. *See* Loan Agreement §§ 10.1 and 10.2. Each business day, cash would be swept from the Deposit Account into a Cash Management Account, where it would be allocated to subaccounts and ultimately disbursed pursuant to that certain Cash Management Agreement dated September 19, 2014, between Debtor, Wells Fargo Bank N.A., and Original Lender. *See id.*

9. The Cash Management Agreement was designed to give Secured Lender greater visibility and control over Debtor's cash position following a Holloman Renewal Event by implementing deposit and spending controls. Debtor never complied with its obligations, however. It never deposited its excess cash into the Excess Cash Reserve Account. *See* Stanton Dec. ¶ 7. It never opened a Deposit Account and, consequently, the Property's tenants continue to pay their rent directly to Debtor, outside the view and control of Secured Lender. Debtor continued to spend cash without the consent of Secured Lender. Debtor's willful failure to

comply with the cash management protocols meant that Secured Lender had no visibility – let alone any control – over Debtor's cash position.

10. Meanwhile, as Debtor's liquidity became constrained, it stopped paying its trade creditors who, in turn, began recording liens against the Property.

11. The Debtor's failure to deposit excess cash or abide by the cash management protocols during the Cash Sweep Period constituted covenant breaches and Events of Default under sections 11.1(a), (n), and (o) of the Loan Agreement. *See* Stanton Dec., ¶ 7. Secured Lender notified Debtor of these defaults in writing. Several more Events of Default followed. Specifically,

   a. on July 18, 2018, Secured Lender notified Debtor that it had violated sections 5.14(a) and 6.1(a)(vii) of the Loan Agreement when it failed to pay the manager of the Property and sought to replace management without giving prior notice to Secured Lender;

   b. on August 17, 2018, Secured Lender notified Debtor of its failure to maintain required reserves and timely pay for work completed at the Property, which caused several contractors to record statutory liens against the Property;

   c. on November 8, 2018, Secured Lender notified Debtor of its failure to repair certain equipment at the Property, and demanded that it transfer rent proceeds to a Deposit Account and cause the statutory mechanics' liens to be removed from the Property within five (5) business days.

12. Secured Lender repeatedly demanded that Debtor cure existing defaults, cause the mechanics' liens to be removed from the Property, and establish the Deposit Account pursuant to section 10.2 of the Loan Agreement. Debtor failed to comply with these requests. Secured Lender documented these Events of Default in various notices delivered to the Debtor. Secured Lender attached these notices to the Claim. *See also* Stanton Dec., ¶¶ 7-9.

13. On December 13, 2018, with Debtor in continuous default, Secured Lender exercised its right to accelerate the Loan, such that the entire Debt became due and payable. *See id.*, ¶ 10.

14. On January 28, 2019 (the **Petition Date**), Debtor commenced this chapter 11 case.

## Response to Claim Objection

### A. The Claim Objection Does Not Rebut the Presumption that the Claim is Valid

15. The Claim Objection seeks to reduce the Claim from $15,385,325.53 to $12,632,574.14 on the ground that none of the accrued interest, fees, charges, and cash advances asserted therein are allowable. Debtor says that the Loan was never in default and, therefore, it has no monetary cure. Debtor contends that its only obligation on the Loan is to make the currently monthly payment of $128,604.

16. The Court shall allow a properly filed proof of claim "except to the extent the claim is unenforceable against the debtor or property of the debtor, under any agreement or applicable law." *See* 11 U.S.C. § 502(b). The Claim is *prima facie* evidence of the amount of the Debt owed by Debtor to Secured Lender. *See* Fed. R. Bankr. P. 3001(f).

17. To rebut the presumption that it is allowable as filed, Debtor must assert some legal reason or factual evidence sufficient to demonstrate a true dispute over the amount stated in the Claim. *See In re Trevino*, 535 B.R. 110, 130 (Bankr. S.D. Tex. 2015); *see also Black's Law Dictionary* 1458 (10th ed. 2014) (**rebut,** *vb.* To refute, oppose, or counteract (something) by evidence, argument, or contrary proof."). Conclusory allegations denying that a default has occurred or that a particular line item in the proof of claim is "overstated" are insufficient to rebut the presumption of validity to which Secured Lender is entitled under Bankruptcy Rule

5

3001(f). *See In re 804 Congress, L.L.C.*, 529 B.R. 213, 219 (Bankr. W.D. Tex. 2015) ("To rebut the claim, the evidence the objecting party produces must be at least equal in probative force to that offered by the proof of claim and which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency) (internal quotation omitted).

18. The Claim Objection does not contain any specific allegations that rebut the factual assertions in the Claim. Debtor repeatedly states that Secured Lender has made "no showing" of the specific circumstances or transactions that would support the amounts asserted in the Claim. *See* Claim Objection, ¶¶ 5, 6, 7, 9, 10, and 11. The Claim contains over one hundred (100) pages of pre-petition correspondence from Secured Lender to Debtor describing various Events of Defaults under the Loan Documents in explicit detail. Debtor does not dispute the events described in these notices of default. Debtor does not dispute that a Cash Sweep Period commenced on August 1, 2017. It provides no justification for failing to transfer Excess Cash to the Excess Cash Reserve Account, failing to open a Deposit Account, or failing to comply with the Cash Management Agreement pursuant to sections 9.5 and 10.2 of the Loan Agreement. Debtor does not dispute that trade creditors and taxing authorities recorded liens against the Property. It does not explain the basis for asserting that any Event of Default was "cured" either. *See* Claim Objection, ¶ 5. Accordingly, the Claim Objection must be overruled because it does not rebut the presumption that Events of Default occurred.[2] *See In re Pursley*, 451 B.R. 213, 229 (Bankr. M.D. Ga. 2011) (noting that the objecting party must refute at least one of the allegations that is essential to the proof of claim's legal sufficiency).

---

[2] Instead of rebutting the several Events of Default covered by the Claim, Debtor argues that Secured Lender has not shown that these defaults were "material." *See* Claim Objection, ¶¶ 5-6. The Events of Default in the Loan Agreement do not have a materiality threshold. The Loan Agreement references "material defaults" four times, all in connection with the Debtor's role as landlord to the Property's tenants. *See* Loan Agreement, §§ 4.25 and 5.13. The parties clearly knew how to use the term "material" in the Loan Agreement, and chose not to when describing Events of Default in Article 11. Accordingly, the Court should ignore this 'red herring' argument that the Events of Default were not sufficiently material to trigger default interests, charges, and fees.

19. Debtor repeatedly asserts that "there has been no showing" to support the various components of the Claim. This is a half-hearted attempt to shift the burden back to Secured Lender: demanding that it "prove up" its claim with an arbitrary yet increasing degree of specificity. *See* Claim Objection, ¶¶ 5-7, 9-11. The Claim Objection must do more to rebut the presumption that the Claim is accurate. Debtor makes no attempt to address Secured Lender's default notices or argue what particular line items are overstated or unenforceable. Accordingly, the Court should overrule the Claim Objection. *See In re Richardson*, 557 B.R. 686, 693 (Bakr. E.D. Ark. 2016) (debtor's "bare statements" in his claim objection were insufficient to rebut presumption that proof of claim was valid).

### B. The Factual and Legal Basis for the Claim

20. As set forth in the Stanton Declaration and the *Declaration of Christopher Fernandez in Support of Secured Lender's Response to Debtor's Claim Objection* attached hereto as **Exhibit B** (the "Fernandez Declaration"), each line item asserted in the Claim is supported by facts and authorized under specific Sections of the Loan Agreement.

#### i. The Court Should Allow the Default Interest and Default Prepayment Premium

21. Debtor states that the Default Interest is a "penalty" and, therefore, it should not be collectible. *See* Claim Objection, ¶ 5. In order to advance this argument, Debtor would have to argue that the Default Interest provision in the Loan Documents was contemplated as a form of liquidated damages. Under Texas law, liquidated damage provisions are enforceable when the damages are uncertain and the stipulated damages are reasonable. *See Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991). An assertion that a liquidated damages provision is a penalty is an affirmative defense that Debtor has the burden of pleading and proving. *See Urban Television Network Corp. v. Liquidity Solutions, L.P.*, 277 S.W.3d 917, 919 (Tex. App. 2009).

22. Default interest is a ubiquitous form of liquidated damages used in practically all lending agreements. In this case, Secured Lender calculated the Default Interest at a rate of 4.055% per annum as specified in Section 2.4(b) of the Loan Agreement. *See* Stanton Dec. ¶ 13(d). Merely labeling the Default Interest provision a "penalty" without more is insufficient to carry the burden of showing that damages in the event of Debtor's default were *not* uncertain or that stipulated damages (as provided in the default interest rate) were unreasonable. *See Urban Television Network Corp.*, 277 S.W.3d at 919. Debtor makes no effort to do this.

23. Debtor also labels the Default Prepayment Premium a "penalty." *See* Claim Objection, ¶ 6. This is not a legal basis for disallowing the Default Prepayment Premium. Texas law authorizes prepayment penalties in commercial lending agreements "whether payable in the event of voluntary prepayment, involuntary prepayment, acceleration of maturity, or other cause that involves premature termination of the loan." *See AMK 2000-A, L.L.C. v. Maliek*, 2011 WL 480025, at *2 (5th Cir. 2011) (citing to Tex. Fin. Code Ann. § 306.005 (West 2006)). Prepayment penalties charge the borrower a fee for the privilege of repaying the loan before maturity. *See Bearden v. Tarrant Sav. Ass'n*, 643 S.W.2d 247, 249 (Tex. App. 1982). In this case, Secured Lender assessed the Default Prepayment Premium when Debtor remitted a monthly payment after Secured Lender had accelerated the Loan. *See* Stanton Dec. ¶ 13(e).

24. The Default Prepayment Premium calculates an amount sufficient to purchase Defeasance Collateral in order to compensate Secured Lender for the loss of the future payments it would have received on the Loan had Debtor continued to make all contractual payments through maturity. *See id.* The calculation is described in Section 2.6(c) of the Loan Agreement and was bargained for by Original Lender. The Claim Objection makes no compelling argument why the Default Prepayment Premium should be disallowed.

25.     Debtor further argues that the Default Interest and Default Prepayment Premium "would be considered unmatured and therefore disallowed pursuant to § 502(b)." *See* Claim Objection, ¶¶ 5-6. Debtor does not explain how these items are unmatured. Section 502(b)(2) of the Bankruptcy Code bars creditors from collecting "unmatured interest," which means interest that accrues post-petition. *See In re Ultra Petroleum Corp.*, 913 F.3d 533, 544 (5th Cir. 2019). The Default Interest in the Claim is calculated from August 1, 2017 to the Petition Date and is matured interest. *See* Stanton Dec. ¶ 13(f). The Default Prepayment Premium is not even interest. It became payable on January 14, 2019 when Debtor tendered a monthly payment after Secured Lender had accelerated the Loan. *See* Stanton Dec. ¶ 13(e). Accordingly, the Default Prepayment Premium had matured as of the Petition Date. *Contrast Ultra Petroleum Corp.*, 913 F.3d at 544 (make-whole premium was unmatured because debtors did not owe it as of petition date).

### ii. The Court Should Allow Secured Lender's Fees, Advances, and Legal Costs

26.     Beginning in September 2018, Secured Lender calculated a monthly Special Servicing Fee at a rate of 0.25% per annum of the principal balance of the Loan. *See* Stanton Dec. ¶ 13(f). Debtor states that the Court should disallow Special Servicing Fees of $12,051.39 because "the loan documents do not call for such a fee and that this is overhead of the Lender that they should absorb." *See* Claim Objection, ¶ 7. It further argues that Secured Lender has included the Special Servicing Fees, Payoff Fee, and Liquidation Fee to "inflate" the Claim. *See id.*, ¶ 7, 8, and 12. In fact, the Special Servicing Fees are allowed pursuant to Section 17.6 of the Loan Agreement. It reads in pertinent part:

> Borrower shall be responsible for any fees and expenses of Lender or any servicer, trustee and any third-party fees and expenses, including, without limitation, **special servicing fees**, work-out fees, **liquidation fees**, and reasonable

9

>> attorneys' fees and disbursements in connection with a modification or restructuring of the Loan, special servicing or work-out of the Loan or enforcement of the Loan Documents.

(Emphasis added). Debtor does not say why the Court should not enforce this particular Section of the Loan Agreement. *See El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 810–11 (Tex. 2012) ("The role of the courts is not to protect parties from their own agreements, but to enforce contracts that parties enter into freely and voluntarily.").

27. The Payoff Fee is a flat fee of $500, which compensates the servicer for preparing a payoff calculation. *See id.* ¶ 13(g). Secured Lender ran two payoff calculations: one in connection with its pre-petition receivership action, and the second in connection with preparing the Claim. *See id.* This fee is allowed under Section 17.6 of the Loan Agreement.

28. With respect to Property Protection Advances, Secured Lender expended $25,165.06 to pay an invoice for legal fees. *See* Stanton Dec. ¶ 13(h). This disbursement occurred on December 31, 2018 and is evidenced by the Prepetition Payment History attached as Exhibit A to the Stanton Declaration. Contrary to Debtor's assertion, legal fees were not payable out of the existing escrow accounts that Secured Lender had established for this Loan. Secured Lender may recoup its attorneys' fees pursuant to Section 17.6 of the Loan Agreement.

29. Finally, as set forth in the Fernandez Declaration, Secured Lender's attorneys incurred fees and expenses of $88,622.61[3] prior to the Petition Date. Unlike the Property Protection Advances, these fees and expenses remain unpaid. These legal fees and the fees Secured Lender paid as Property Protection Advances, were reasonable and necessary to protect and assert Secured Lender's rights and interests under the Loan Documents. *See* Fernandez Dec. ¶ 6. Among the services performed by Secured Lender's outside counsel was the

---

[3] Secured Lender miscalculated legal fees at $92,615.50 in the Claim. The proper amount of unpaid legal fees as of the Petition Date is $88,622.61 and the Claim should be allowed in the amount of

commencement of a state court receivership proceeding in late 2018. *See* Fernandez Dec. ¶ 5. Secured Lender may recover attorneys' fees from Debtor as a cost of enforcement pursuant to Section 17.6 of the Loan Agreement.

## Conclusion

30.     Debtor has failed to articulate any specific objections to overcome the prima facie validity of the Claim. Furthermore, each line item in the Claim was accurately calculated, legally justified under the Loan Documents, and factually supported by the Stanton and Fernandez Declarations. Secured Lender is entitled to an allowed claim in this bankruptcy case of not less than $15,381,332.64.[4]

WHEREFORE, Secured Lender respectfully requests that this Court (a) overrule the Claim Objection, (b) allow the Claim as filed, and (c) grant Secured Lender such further relief as the Court deems appropriate.

[*Remainder of Page Intentionally Left Blank*]

---

[4] This figure reflects a downward adjustment of ($3,992.89) from the Claim amount as filed in order to accurately reflect Secured Lenders' pre-petition legal fees.

**DATED** this 6th day of September, 2019.

                        Respectfully submitted,

                        **K&L GATES LLP**

                        By:   /s/Liz Boydston
                        Liz Boydston, SBN 24053684
                        liz.boydston@klgates.com
                        1000 Main Street, Suite 2550
                        Houston, Texas 77002
                        Tel: 713.815.7339
                        Fax: 713.815.7301

                              -and-

                        Christopher Fernandez, (*admitted pro hac vice*)
                        NC Bar No. 27818
                        214 N. Tryon Street
                        Charlotte, NC  28202
                        Phone: 704-331-7508
                        Fax: 704-331-7598
                        chris.fernandez@klgates.com

                        David Mawhinney (*admitted pro hac vice*)
                        Mass. Bar No. 681737
                        1 Lincoln Street
                        Boston, Massachusetts 02111
                        Tel: 617.951.9178
                        Fax: 617.261.3175
                        david.mawhinney@klgates.com

                        ATTORNEYS FOR THE SECURED CREDITOR, WILMINGTON TRUST, N.A., AS TRUSTEE FOR MORGAN STANLEY BANK OF AMERICA MERRILL LYNCH TRUST 2014-C19, COMMERCIAL MORTGAGE PASS THROUGH CERTIFICATES, SERIES 2014-C19

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on September 6 2019, a true and correct copy of the foregoing document was served via the Court's electronic noticing system to all those who have consented to service and to Debtor's counsel via electronic mail.

                                                                  /s/Liz Boydston