**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
05/29/2020

| | | |
|---|---|---|
| IN RE: | § | |
| **NORTHBELT, LLC** | § | **CASE NO: 19-30388** |
| Debtor | § | |
| | § | **CHAPTER 11** |

<u>**MEMORANDUM OPINION**</u>
*Resolving ECF Nos. 88, 96, 99, 125*

When a debtor proposes a plan for reorganization, there is often a tension between the Debtor's hope for confirmation and the reality that one dollar cannot do two dollars' work. In this single asset real estate case involving a 12-story commercial office building in Houston, Texas, Northbelt, LLC, proposed a Chapter 11 plan for reorganization that was swiftly met with staunch opposition by its major creditor. Pending before the Court are three separate but related matters: (i) Debtor's Objection to Wilmington Trust, N.A., As Trustee For Morgan Stanley Bank Of America Merrill Lynch Trust 2014-c19, Commercial Mortgage Pass Through Certificates, Series 2014-C19's Proof of Claim No. 5; (ii) Wilmington Trust's N.A., As Trustee For Morgan Stanley Bank Of America Merrill Lynch Trust 2014-c19, Commercial Mortgage Pass Through Certificates, Series 2014-C19's Motion for Relief from the Automatic Stay; and (iii) Northbelt, LLC's First Amended Chapter 11 Plan.

The Court conducted an initial hearing on plan confirmation and claim objection on August 12, 2019, held further hearings on all three matters in an omnibus fashion on December 11, 2019, and concluded the hearings on January 16, 2020. At the conclusion, the Court took the matter under advisement and ordered briefing. All briefs have now been submitted and the matters are ripe for determination. After considering the pleadings on file, arguments of counsel, applicable law, credibility of witnesses, all other evidence in the record and for the reasons set

forth in this Court's Memorandum Opinion, (i) Debtor's Claim Objection is sustained in part and overruled in part.  Wilmington Trust, As Trustee For Morgan Stanley Bank Of America Merrill Lynch Trust 2014-c19, Commercial Mortgage Pass Through Certificates, Series 2014-C19's shall have an allowed claim in an amount not to exceed $15,060,084.74 subject to the filing of an amended proof of claim within fourteen (14) calendar days after entry of this Court's Order;[1] (ii) Wilmington Trust As Trustee For Morgan Stanley Bank Of America Merrill Lynch Trust 2014-c19, Commercial Mortgage Pass Through Certificates, Series 2014-C19's Motion For Relief From the Automatic Stay is denied but conditioned upon Debtor filing a modified plan within forty-five (45) calendar days after entry of this Court's Order; and (iii) Northbelt, LLC's Plan of Reorganization dated June 13, 2019, is not confirmed.

## I.      FINDINGS OF FACT

This Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, which is made applicable to contested matters pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014.  To the extent that any finding of fact constitutes a conclusion of law, it is adopted as such.  To the extent that any conclusion of law constitutes a finding of fact, it is adopted as such.  This Court made certain oral findings and conclusions on the record. This Memorandum Opinion supplements those findings and conclusions.  If there is an inconsistency, this Memorandum Opinion controls.

### a.  Background History

On September 19, 2014, Northbelt, LLC ("*Northbelt*" or "*Debtor*") and Bank of America, N.A. ("*BofA*") entered into an agreement ("*Loan*") whereby BofA loaned Northbelt

---

[1] The allowable amount of Wilmington Trust's Proof of Claim is yet to be determined for the reasons discussed herein. Specifically, within 14 calendar days after entry of this Court's Memorandum Opinion and Order on the Court's docket, Wilmington Trust must amend its claim in accordance with this Court's Memorandum Opinion and Order as it pertains to the Default Interest and Default Prepayment Premium portions of its claim.

$13,500,000.00 for the acquisition of a 12-story commercial office building located at 333 N. Sam Houston Parkway, Houston, Texas ("*Property*").   The Loan was later transferred by assignment to Wilmington Trust As Trustee For Morgan Stanley Bank Of America Merrill Lynch Trust 2014-c19, Commercial Mortgage Pass Through Certificates, Series 2014-C19 ("*Wilmington Trust*" or "*Secured Lender*"), and as of September 19, 2014, Wilmington Trust is the present holder as evidenced by the following documents,: (i) a promissory note ("*Note*") in the original principal amount of $13,500,000 executed and delivered by Northbelt to BofA, (ii) a Loan Agreement ("*Loan Agreement*") by and between Northbelt and BofA, and (iii) a Deed of Trust, Assignment of Leases and Rents, and Security Agreement ("*Deed of Trust*") executed and delivered by Northbelt to a trustee named for the benefit of BofA.   Wells Fargo Bank, N.A. ("*Wells Fargo*") is the master servicer for Wilmington Trust and is authorized to service the Loan on Wilmington Trust's behalf.   Rialto Capital Advisors, LLC ("*Rialto*") is the special servicer for Wilmington Trust and is authorized to service the Loan on Wilmington Trust's behalf.

Following the bundling and assignment of the Loan, Wilmington Trust claimed that Northbelt triggered several defaults under the provisions of the Loan, which Wilmington Trust then used as grounds to move for appointment of a receiver.   Shortly thereafter, Debtor filed the instant Chapter 11 petition ("*Petition*") as a single asset real estate ("*SARE*") case on January 28, 2019 ("*Petition Date*").[2]

Debtor is a single purpose entity created to acquire, own, and hold the Property.[3] Pursuant to Debtor's Schedule A, Debtor values the Property at $19,000,000.00.[4]   Additionally

---

[2] ECF No. 89 at 11.
[3] *Id.* at 10.
[4] ECF No. 137.

scheduled are $358,459.93 in ad valorem tax liens, $256,921.27 in mechanic and materialman's liens, and $12,700,000.00 in favor of Wilmington Trust, leaving an equity cushion—according to Debtor's value of the Property—in the amount of $5,684,618.80.  Unsurprisingly, Wilmington Trust values the Property only at $7,600,000.00

On April 1, 2019, the Court approved an application employing Belvoir Asset Management LLC to operate and manage the Property.[5]  On April 23, 2019, Debtor filed its Disclosure Statement and Plan[6] which were both subsequently amended ("*Amended Plan*") on June 13, 2019, and are currently the live pleadings before the Court.[7]  On June 17, 2019, this Court approved the Disclosure Statement, scheduled plan confirmation for August 12, 2019, and set out certain deadlines to file ballots and objections.[8]  On August 5, 2019, Wilmington Trust filed its Objection to Confirmation of Debtor's First Amended Plan of Reorganization ("*Objection to Confirmation*").[9]  Two days later, Debtor filed its Objection to Wilmington Trust's Proof of Claim No. 5, ("*Claim Objection*").[10]  On October 4, 2019, Wilmington Trust filed its Motion For Relief From The Automatic Stay, ("*Motion For Relief*").[11]  A full day trial on all three matters was conducted on December 11, 2019, which was continued and concluded on January 16, 2020.  At the conclusion of trial, the Court took the matter under advisement and ordered the parties to file a joint stipulation of undisputed facts.

### b. Factual Stipulations of the Parties

On February 6, 2020, the parties filed the following list of stipulated facts:[12]

---

[5] ECF No. 42.
[6] ECF Nos. 53, 54.
[7] ECF Nos. 88, 89.
[8] ECF No. 91.
[9] ECF No. 96.
[10] ECF No. 99.
[11] ECF No. 125.
[12] ECF No. 153.

*Procedural History*

1.  On January 28, 2019 (the "*Petition Date*"), the Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code (the "*Petition*"). Since the Petition Date, the Debtor has operated as a debtor-in-possession.

2.  Debtor owns and operates that certain commercial real property located at 333 N. Sam Houston Parkway in Houston, Texas (the "*Property*") from which it derives substantially all of its income. The Property is a 12-story, atrium style multi-tenant office building. On February 13, 2019, the Court entered an agreed order (the "*Interim Cash Collateral Order*") [Docket No. 22] between Secured Lender and the Debtor governing the Debtor's use of Secured Lender's cash collateral during this Chapter 11 case. Among other things, the Interim Cash Collateral Order granted Secured Lender liens on the post-petition cash generated from the Property in the form of rents. The Debtor's authority to use this cash has been limited to a court-approved budget. Interim Cash Collateral Order further required that, "as adequate protection in accordance with Section 363(e) of the Bankruptcy Code, the Debtor shall pay to the Secured Lender on the 1st day of the month all cash in excess of actual operating expenses incurred pursuant to the budget…

3.  On February 25, 2019, Debtor filed its initial schedules of assets and liabilities [Docket No. 34] and statement of financial affairs [Docket No. 35]. The Debtor filed amended schedules of assets and liabilities on December 10, 2019 (as amended, the "*Schedules*") [Docket No. 137].

4.  On February 28, 2019, the Court entered an agreed order (the "*Final Cash Collateral Order*") [Docket No. 38] approving Debtor's use of cash collateral on a final basis on terms substantially similar to the Interim Cash Collateral Order.

5.  On April 23, 2019, Debtor filed its Chapter 11 Plan of Reorganization [Docket No. 53] and accompanying Disclosure Statement [Docket No. 54].

6.  On June 11, 2019, Secured Creditor filed a claim in the amount of $15,385,325.53 ("*Secured Lender's Proof of Claim*") [Claim No. 5]. On June 13, 2019, the Debtor filed its First Amended Plan of Reorganization [Docket No. 88] (the "*Plan*")[13] and accompanying Amended Disclosure Statement (the "*Disclosure Statement*") [Docket No. 89]. The Court approved the Disclosure Statement on June 17, 2019.

7.  On August 5, 2019, Secured Lender filed an objection to confirmation of the Plan (the "*Plan Objection*")[14] [Docket No. 96]. The Debtor filed a response to Secured Lender's Plan Objection on August 9, 2019 [Docket No. 103]. Secured Lender filed its Declaration of Jonathan Stanton in support of the Plan Objection on August 12, 2019 [Docket No. 106].

---

[13] Also referred to herein as "Amended Plan."
[14] Also referred to herein as "Objection to Confirmation."

8.  On August 7, 2019, Debtor filed an objection to Secured Lender's Proof of Claim (the "*Claim Objection*") [Docket No. 99] and its Declaration of Donald Testa in support of the Claim Objection on August 8, 2019 [Docket No. 102]. Secured Lender filed a response to Debtor's Claim Objection on September 6, 2019 [Docket No. 113].

9.  Secured Lender filed a Motion for Relief from Stay on October 4, 2019 (the "*Stay Relief Motion*")[15] [Docket No. 125]. The Debtor objected to Secured Lender's Stay Relief Motion on October 28, 2019 [Docket No. 129].

10. The Court held a preliminary hearing on confirmation of the Plan on August 12, 2019. The confirmation hearing was continued until December 11, 2019 and concluded on January 16, 2020.

## *General Background*

11. Northbelt, is a single-member, special purpose, Delaware limited liability company formed on or about April 29, 2014.

12. Dr. Testa is the president of Northbelt.

13. The Testa Family Limited Partnership II ("*FLP*") owns 100% of the limited liability company interests in Northbelt.

14. Dr. Testa and his wife are the managing members of Spectacular Real State LLC the general partner of the FLP. They each own one half of one percent equity interest of the FLP; their two adult children own 49.5% each as limited partners.

## *Secured Lender's Loan Documents*

15. On or about September 19, 2014, Northbelt and Bank of America, N.A. ("*BofA*") entered into that certain Loan Agreement, pursuant to which BofA loaned Northbelt $13,500,000.00 (the "*Loan*") for the acquisition of the Property. The Purchase price was $18,000,000 and Northbelt contributed a down payment of $4,500,000.

16. Pursuant to the Loan Agreement, Northbelt executed and delivered to BofA that certain Promissory Note dated as of September 19, 2014 (the "*Note*"), wherein Northbelt promised and agreed to pay to BofA the original principal amount of Thirteen Million Five Hundred Thousand Dollars ($13,500,000.00), together with interest thereon, pursuant to the terms thereof, having a Maturity Date on the Payment Date occurring in October, 2024.

---

[15] Also referred to herein as "Motion for Relief."

17. The non-default rate of interest on the outstanding principal balance of the Note is 5.036% (the "*Non-Default Rate*")[16]. The default rate of interest (the "*Default Rate*") is four percent in excess of the Non-Default Rate.

18. Secured Lender began accruing interest at the Default Rate as of August 1, 2017.

19. Pursuant to the Loan Agreement, on or about September 19, 2014, Northbelt executed and delivered to BofA that certain Cash Management Agreement (the "*Cash Management Agreement*").

20. On or about September 19, 2014, Northbelt, as grantor, executed that certain Deed of Trust, Assignment of Leases and Rents, and Security Agreement in favor of James A. Johnson, as Trustee, for the benefit of BofA, (as amended and as assigned, the "*Deed of Trust*").

21. The Note, the Loan Agreement, the Cash Management Agreement and the Deed of Trust, together with any and all documents governing, evidencing and/or securing Northbelt's obligations thereunder or related thereto are hereinafter referred to as the "Loan Documents."

22. The Deed of Trust encumbers the Property, and grants a security interest therein, together with all other collateral described in the Deed of Trust (collectively, the "*Deed of Trust Real Estate Collateral*").

23. The Deed of Trust granted to BofA and its successors and assigns a first-priority lien on and security interest in all other property of Northbelt that may be subject to the Uniform Commercial Code, as further described in the Deed of Trust (collectively, the "*Security Agreement Collateral*," and collectively with the Deed of Trust Real Estate Collateral, the "*Collateral*"), to secure the repayment of all indebtedness of Northbelt owed to BofA and the performance of the obligations of Northbelt to BofA under the Note and the other Loan Documents.

24. BofA properly perfected its liens on the Deed of Trust Real Estate Collateral by recording: (i) the Deed of Trust in the Official Public Records of Harris County, Texas (the "*Records*"), on or about September 22, 2014, as Instrument No. 20140423422; and (ii) a UCC-1 fixture filing in the Records, on or about September 22, 2014, as Instrument No. 20140423424 (the "*Fixture Filing*").

25. Thereafter, Secured Lender recorded that certain Assignment of Deed of Trust, Assignment of Leases and Rents and Security Agreement in the Records on or about February 16, 2015, as Instrument No. 20150062325, naming Secured Lender as the assignee of the Deed of Trust (the "*Deed of Trust Assignment*").

---

[16] Also referred to herein as "contract rate."

26. Secured Lender recorded that certain UCC-3 in the Records on or about February 16, 2015, as Instrument No. 20150062326, naming Secured Lender as the secured party (the "*Fixture Filing Assignment*").

27. BofA properly perfected its liens on the Security Agreement Collateral by filing a UCC-1 financing statement, naming Northbelt as debtor and BofA as secured party, with the Delaware Secretary of State's office on or about September 22, 2014 as Initial Filing No. 2014 3784519 (as amended and assigned, the "*Financing Statement*").

28. Secured Lender filed that certain UCC-3 with the Delaware Secretary of State on or about February 14, 2015, as Amendment No. 2015 0650183, naming Secured Lender as the secured party (the "*UCC Assignment*").

29. Accordingly, as of the Petition Date, Secured Lender is the holder of the Note and the payee of record to whom the obligations of Northbelt described in the Note are payable. Further, as of the Petition Date, Secured Lender is the secured party of record for whom the benefits described in the Deed of Trust shall accrue.

30. Rialto Capital Advisors, LLC is the special servicer and attorney-in-fact for the Secured Lender.

## *Additional Information*

31. The non-default monthly payment on the Note is $128,604.51, which includes a principal and interest component of $72,768.23 and a reserve component of $55,836.28.

32. The Loan Agreement requires Northbelt to make monthly reserve payments into the following accounts: Replacement Reserve Account, Leasing Reserve Account, and Tax and Insurance Reserve Account (as each term is defined in the Loan Agreement) (collectively, the "*Reserve Escrow*").[17]  The Reserve Escrow was established pursuant to, and is governed by the Loan Agreement.

33. As of February 6, 2020, the respective balances in the Reserve Escrow accounts are as follows:[18]

    i.     Leasing Reserve Account: $ 381,422.72
    ii.    Replacement Reserve Account: $ 437,623.31
    iii.   Insurance Reserve Account: $ 170,854.26
    iv.    Tax Reserve Account: $ 99,076.61
    v.     Free Rent Reserve $ 42,744.00

---

[17] Contemporaneously with the closing of the Loan, Northbelt made a one-time deposit of $42,744 in Free Rent Reserve Funds, consistent with § 9.9 of the Loan Agreement. There are no monthly payments associated with this account.
[18] Total of $1,131,720.90 in the Reserve Escrow accounts.

34. Secured Lender has submitted an appraisal dated as of September 6, 2019 (the "*Appraisal*"), which values the Property at $7,600,000.

35. Secured Lender sent certain default letters to the Debtor dated: May 17, 2018; July 18, 2018; August 17, 2018; November 8, 2018; and December 13, 2018 (each a "*Default Notice*," and collectively, the "*Default Notices*").

36. Currently about half of the Property leases are triple net (NNN); the other half are modified gross (base year) leases.

37. On December 14, 2018, Secured Lender petitioned the District Court of Harris County for the immediate appointment of a receiver to take control of the Property and an order enjoining the Debtor and its principals from disposing of its assets. Shortly thereafter, the Debtor commenced this Chapter 11 case.

## II.   CONCLUSIONS OF LAW

### a.   Jurisdiction, Venue, and the Court's Constitutional Authority to Enter a Final Order

This Court holds jurisdiction pursuant to 28 U.S.C. § 1334 and now exercises its jurisdiction in accordance with Southern District of Texas General Order 2012–6.[19] The matters before the Court constitute core proceedings under 28 U.S.C. § 157(b)(2)(A), (B), (G), (L). Therefore, the Court holds constitutional authority to enter a final order and judgment on all three matters.[20] Finally, venue is governed by 28 U.S.C. §§ 1408, 1409. Venue is proper because Debtor's principal place of business has been in the Southern District of Texas for the 180 days immediately preceding the Petition Date.

### b.   Wilmington Trust's Proof of Claim & Related Objection

#### 1.   Bankruptcy Rule 3001 Prima Facie Validity and Burdens of Proof

---

[19] *In re: Order of Reference to Bankruptcy Judges*, Gen. Order 2012–6 (S.D. Tex. May 24, 2012).
[20] *See Wellness Intern. Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1938–40 (2015); *Stern v. Marshall*, 564 U.S. 462 (2011).

In order to have a properly filed claim, Rule 3001(c) requires that a claimant include certain supporting information to evidence the Proof of Claim.[21]  The relevant portions of Rule 3001(c) are as follows:

> (1)    Claim based on a writing . . . [W]hen a claim, or an interest in property of the debtor securing the claim, is based on a writing, a copy of the writing shall be filed with the proof of claim.
>
> . . .
>
> (A)    If, in addition to its principal amount, a claim includes interest, fees, expenses, or other charges incurred before the petition was filed, an itemized statement of the interest, fees, expenses, or charges shall be filed with the proof of claim.

Further compliance with the Bankruptcy Rules requires, *inter alia*, that a proof of claim "conform substantially to the appropriate Official Form."[22]  Official Form 410 is the official proof of claim form, and paragraph 8 therein requires the claimant to "attach redacted copies of any documents that support the claim as required by Bankruptcy Rule 3001(c)," such as promissory notes, purchase orders, invoices, itemized statements or running accounts, contracts, judgments, mortgages and security agreements or a summary of such documents.[23]

If a proof of claim complies with the requirements of Rule 3001, the claim "shall constitute prima facie evidence of the validity and amount of the claim."[24]  If an objection to the proof of claim is filed, the objecting party is tasked with putting forth such evidence sufficient to rebut the presumption of validity and establish that the claim should be disallowed.[25]  To successfully rebut the presumption that such claim is allowable as filed, the objecting party must

---

[21] *See* Fed. R. Bankr. P. 3001(c).

[22] *See* Fed. R. Bankr. P. 3001 (emphasis added).

[23] *In re Gilbreath*, 395 B.R. 356, 362 (Bankr. S.D. Tex. 2008) (Bankruptcy Rule 9009 states that the Official Forms "shall be observed."); *See* Fed. R. Bankr. P. 9009.

[24] *See* Fed. R. Bankr. P. 3001(f); *see Matter of Fid. Holding Co., Ltd.*, 837 F.2d 696, 698 (5th Cir. 1988).

[25] 11 U.S.C. § 502(b); *In re Trevino*, 535 B.R. 110, 130 (Bankr. S.D. Tex. 2015); *see In re DePugh,* 409 B.R. 84, 97 (Bankr. S.D. Tex. 2009) (". . . if the debtor objects to that claim, he or she must produce evidence sufficient to rebut the presumption of validity and establish that the claim should be disallowed pursuant to § 502(b).").

produce evidence that is equal in probative force to that of the proof of claim.[26]  As stated by one court in the Fifth Circuit, this means that "the objecting party [must] produc[e] specific and detailed allegations that place the claim into dispute, by the presentation of legal arguments based upon the contents of the claim and its supporting documents, or by the presentation of pretrial pleadings, such as a motion for summary judgment, in which evidence is presented to bring the validity of the claim into question."[27]  If the objecting party successfully presents enough evidence to meet that burden, the burden then shifts and the claimant must, by a preponderance of evidence, prove the validity of the claim.[28]  The ultimate burden of proof always rests upon the claimant.[29]  Thus, the proof of claim is some evidence as to its validity and amount.

### 2.  Wilmington Trust's Proof of Claim No. 5

Wilmington Trust filed its secured Proof of Claim No. 5 in the amount of $15,385,325.53 ("*Proof of Claim*") on June 11, 2019.[30]  Wilmington Trust's Claim consists of the following:[31]

| Principal | $ 12,632,574.14 |
|---|---|
| Interest | $ 54,781.86 |
| Default Interest | $ 796,961.02 |
| Late Charges | $ 5,144.18 |
| Default Prepayment Premium | $ 1,612,354.00 |
| Special Servicing Fees | $ 12,051.40 |
| Payoff Fee | $ 1,000.00 |

---

[26] *See In re Simmons*, 765 F.2d 547, 552 (5th Cir. 1985).

[27] *See In re High Std. Mfg. Co*., 2016 Bankr. LEXIS 3701, *1 (Rebuttal evidence must be equal in probative value to successfully rebut a creditor's proof of claim. This can be done by the objecting party producing specific and detailed allegations that place the claim into dispute, by the presentation of legal arguments based upon the contents of the claim and its supporting documents, or by the presentation of pretrial pleadings, such as a motion for summary judgment, in which evidence is presented to bring the validity of the claim into question).

[28] *In re Windmill Run Assocs., Ltd*., 566 B.R. 396, 451 (Bankr. S.D. Tex. 2017).

[29] *Matter of Fid. Holding Co., Ltd*., 837 F.2d at 698; *Matter of Porretto*, 761 F. App'x 437, 442 (5th Cir. 2019).

[30] Wilmington Trust Ex. 5.

[31] *Id.*

| Property Protection Advances | $ 25,165.06 |
|---|---:|
| Force Placed Insurance | $ 1,142.96 |
| Legal Fees | $ 92,615.50 |
| Interest on Advances | $ 122.44 |
| Liquidation Fee | $ 151,412.97 |
| **Total** | **$ 15,385,325.53** |

In support of its position, Wilmington Trust attached Loan Documents to its Proof of Claim including:

    i.       Promissory Note in the original principal amount of $13,500,000.00 executed and delivered by Debtor to BofA;[32]

    ii.      Loan Agreement by and between Debtor and BofA;[33]

    iii.    Deed of Trust, Assignment of Leases and Rents and Security Agreement executed and delivered by Debtor to the trustee named therein for the benefit of BofA;[34]

    iv.    Cash Management Agreement;[35]

    v.     Assignments of Loan Documents and Security Interests from BofA to Wilmington Trust;[36] and

    vi.    UCC Financing Statements Related to Wilmington Trust's Collateral.[37]

As stipulated by both parties, the aforementioned documents "together with any and all documents governing, evidencing and/or securing Northbelt's obligations thereunder or related thereto are the Loan Documents."[38]

       Here, the Court finds that Wilmington Trust's Proof of Claim was properly filed pursuant to Rule 3001 because the Proof of Claim was based on a writing (i.e. the Note, Loan Agreement,

---

[32] Wilmington Trust Ex. 11.
[33] Wilmington Trust Ex. 12.
[34] Wilmington Trust Ex. 13.
[35] Wilmington Trust Ex. 5 Bates 383.
[36] Wilmington Trust Ex. 14.
[37] Wilmington Trust Ex. 15.
[38] ECF No. 153.

Deed of Trust, Assignment of Deed of Trust, and Financing Statement) and the interest, fees, expenses, and other charges sought by Wilmington Trust were provided for in an itemized statement.[39]  Accordingly, Wilmington Trust's Proof of Claim is afforded prima facie validity.

On August 7, 2019, Debtor filed an objection to the $15,385,325.53 Proof of Claim.[40] However, in order to be viable, such objection must be couched in one of the statutory grounds for disallowance found in § 502.[41]

### 3.  Section 502(b) and Grounds for Disallowance

Section 502 provides that "a claim or interest, proof of which is filed under § 501 of this title, is deemed allowed, unless a party in interest . . . objects."[42]  The legislative history of § 502 provides in relevant part, that "a proof of claim or interest is *prima facie* evidence of the claim or interest.  Thus, it is allowed under subsection (a) unless a party in interest objects."[43]

Once a claim objection is raised, the court, after notice and a hearing, shall determine the amount of the claim as of the petition date and "shall allow such claim in such amount" unless the claim falls under one of the nine statutory grounds for disallowance listed in § 502(b)(1)-(9).[44] Section 502(b) of the Code sets forth nine grounds for disallowance of a claim.   In particular, a bankruptcy court may disallow a claim if the claim:

1.  is unenforceable against the debtor under any agreement or applicable law;

2.  is for unmatured interest;

3.  is for property tax that exceeds the value of the estate's interest in the property;

---

[39] *See* Wilmington Trust Ex. 5; *see* FED. R. BANKR. P. 3001(c).
[40] ECF No. 99.
[41] 11 U.S.C. § 502.
[42] 11 U.S.C. § 502(a).
[43] House Rep. No. 95-595, 95th Cong., 1st Sess. 351 (1977); Senate Rep. No. 95-989, 95th Cong., 2d Sess. 62 (1978).
[44] *In re DePugh*, 409 B.R. at 96; *see* 11 U.S.C. § 502.

4. is for services of an insider or attorney of the debtor and such claim exceeds the reasonable value of such services;

5. is for unmatured debt on certain alimony and child support obligations;

6. is for certain damages resulting from the termination of a lease contract;

7. is for certain damages resulting from the termination of an employment contract;

8. result[ed] from a reduction, due to late payment, in the amount of credit available to the debtor in connection with an employment tax on wages, salaries, or commissions earned from the debtor; or

9. was not timely filed.[45]

Section 502 addresses the form and content of claims but does not, by itself, establish grounds for disallowance of a claim.[46]  Rather, Rule 3001 allocates the burden of proof with respect to a proof of claim for which an objecting party has raised an objection that would warrant disallowance under § 502.[47]  The court in *In re DePugh* described the interplay between § 502 and Rule 3001 during a proof of claim dispute.[48]  If, for example, a creditor files a proof of claim in full compliance with Rule 3001, that claim is deemed prima facie valid and, if the debtor objects to that claim, he or she must produce evidence sufficient to rebut the presumption of validity and establish that the claim should be disallowed pursuant to § 502(b).[49]

Here, the Court already found that Wilmington Trust's Proof of Claim was in full compliance with Rule 3001 and as such was accorded prima facie validity.  Thus, Debtor must

---

[45] *See* 11 U.S.C. § 502.
[46] *See id.*; *In re Tran*, 369 B.R. 312, 320 (S.D. Tex. 2007) ("In other words, courts must generally allow a properly filed claim, but if one of the nine statutory provisions governs, then the court may summarily disallow the claim.").
[47] *Id.*; *see* FED. R. BANKR. P. 3001.
[48] *In re DePugh*, 409 B.R. at 97–98; *see also In re Gilbreath*, 395 B.R. at 361–65.
[49] *Id.*

produce evidence sufficient to rebut the presumption of validity and establish that the claim should be disallowed pursuant to § 502(b).[50]

### 4.  Northbelt's Objection to Wilmington Trust's Proof of Claim

Debtor objects to the Claim of Wilmington Trust because, inter alia, Wilmington Trust has overstated its claim by including fees, additional interest and costs for which it does not possess a right to payment.[51]   Essentially, Debtor's Claim Objection can be broken down into nine separate components as follows:[52]

1. *Interest.* Wilmington Trust is not entitled to interest because the Debtor has continued throughout its disputes with Wilmington Trust to pay all principal and interest that has become due and payable on the loan.

2. *Default Interest.* Wilmington Trust is not entitled to Default Interest because: (i) there has been no showing that a material default occurred that would warrant Default Interest; and (ii) any Default Interest, by its very nature, would be considered unmatured and therefore disallowed pursuant to §502(b). In the alternative, the Debtor asserts that any alleged default was cured, was not material and should not result in the imposition of Default Interest. Further the inclusion of Default Interest is a penalty against the Debtor and should not be collectable.

3. *Default Prepayment Premium.* Wilmington Trust is not entitled to Default Prepayment Premium because (i) there has been no showing that a material default occurred that would warrant Default Prepayment Premium; and (ii) any Default Prepayment Premium, by its very nature, would be considered unmatured and therefore disallowed pursuant to § 502(b). In the alternative, the Debtor asserts that any alleged default was cured, was not material and should not result in the imposition of the Default Prepayment Premium. Further the inclusion of the Default Prepayment Premium is a penalty against the Debtor and should not [sic] collectable.

4. *Special Servicing Fees.* Wilmington Trust is not entitled to Special Servicing Fees because the Creditor has not shown that it has performed special services that were not contemplated and bargained for under the base servicing agreement. Further, to the extent the Creditor has performed "special services," there has been no showing that the fee is reasonable and necessary and not included simply to inflate the claim. Further, Debtor would argue that the loan documents do not call for such a fee and that this is overhead of Wilmington Trust that they should absorb.

---

[50] *See* 11 U.S.C. § 502(b).
[51] ECF No. 99.
[52] *Id.*

5.  *Payoff Fee.* Wilmington Trust is not entitled to a Payoff Fee because the loan has not been paid off. This fee is included simply to inflate the Creditor's claim.

6.  *Property Protection Advances.* Wilmington Trust is not entitled to Property Protection Advances because there has been no showing that the Creditor actually advanced monies on behalf of the Debtor to warrant reimbursement. Further, to the extent the Creditor advanced any monies on behalf of the Debtor, there has been no showing that the fee is reasonable and necessary and not suggested simply to inflate the claim. Further, the Debtor has escrow accounts set up that would provide for these payments if they are legitimate.

7.  *Force Placed Insurance.* Wilmington Trust is not entitled to reimbursement for Force Placed Insurance because there has been no showing that the Debtor failed to properly insure the collateral; nor has there been a showing that a Force Placed Insurance policy was ever issued and paid for by Wilmington Trust and that if such a policy was obtained that Wilmington Trust cannot be reimbursed for such payment since the property has never not been insured.

8.  *Legal Fees.* Wilmington Trust is not entitled to $92,615.50 in Legal Fees because there has been: (i) no showing that the fee is reasonable and necessary; and (ii) no showing that the fee accrued prepetition. Further, Debtor disputes such fees since there was no default in the loan and Wilmington Trust merely ran up fees trying to take the Debtor's property.

9.  *Liquidation Fee.* Wilmington Trust is not entitled to a Liquidation Fee because the loan has not been liquidated, and the fee only serves as an add-on fee to inflate the claim without any showing of damages in this regard to warrant payment.

In light of Debtor's Claim Objection, the validity and amount to which Wilmington Trust is entitled under each component of the Proof of Claim, if any, must be evaluated.[53]

### A. Principal

In its Claim Objection, Debtor raised no specific allegations or references to the $12,632,574.14 of principal listed in Wilmington Trust's Proof of Claim.[54]  Instead, the first contention made by the Debtor with respect to the principal was the testimony of Donald Testa ("*Dr. Testa*"), where he stated that "I'm not aware but I would like a recounting of that number to prove up that number" when asked if he was aware of any errors, omissions, or corrections in

---

[53] *See* 11 U.S.C. § 502(b); FED. R. BANKR. P. 3001(f).
[54] Wilmington Trust Ex. 5-1.

the principal amount due under the Proof of Claim.[55]  In essence, Debtor orally supplemented its Claim Objection at trial by objecting to the principal amount.  Dr. Testa's testimony was not met with any objection by Wilmington Trust and as a result, the Court recognizes the objection as grounds for disallowance under § 502(b)(1).[56]

In its objection to the principal amount of the claim, Debtor contends that Wilmington did not offer into evidence an authenticated amortization schedule or payment history to support this figure and invites the Court to require the authentication of the amount before allowing the claim.[57]  However, an objection to the form and content of Wilmington Trust's principal claim does not, by itself, establish grounds for disallowance of the claim.[58]

The Loan Documents establish Wilmington Trust's ownership of the claim, and Debtor did not contest that it entered into the Loan Documents, including the Note in the original principal amount of $13,500,000.00.[59]  Without more, Debtor failed to produce any rebuttal evidence necessitating a correction or recalculation of the principal.  Debtor did not offer probative rebuttal evidence or make any detailed allegations to shift the ultimate burden to Wilmington Trust.  Debtor's assertions regarding the principal due are nothing more than grievances.  Accordingly, Debtor's objection is overruled and Wilmington Trust's claim of $12,632,574.14 in principal is allowed pursuant to § 502(a).[60]

---

[55] 12/11/2019 Hr. 76: 2–6.
[56] *See* ECF No. 99 (Debtor "expressly reserve[d] the right to amend, modify or supplement the objection asserted herein and to file additional objections to the Proof of Claim or any other claims (whether filed or scheduled or not) which may be asserted by Debtor.").
[57] *Id.*
[58] *See* FED. R. BANKR. P. 3001; *see In re DePugh*, 409 B.R. at 97–98.
[59] Wilmington Trust Ex. 11; ECF No. 153.
[60] *See* 11 U.S.C. § 502(a).

### B.  Interest

As to Wilmington Trust's interest claim in the amount of $54,781.86 ("*Interest*"), Debtor asserts that Wilmington Trust is not entitled to Interest because the Debtor has continued throughout its disputes with Wilmington Trust to pay all principal and interest that has become due and payable on the loan.[61]  At trial, Dr. Testa testified that Debtor never missed a payment of the principal, interest, and reserves to Wilmington Trust.[62]  Dr. Testa also testified that the $54,781.86 interest payment was made to Wilmington Trust.[63]  The Court finds that Dr. Testa's credible testimony brings Debtor's objection under § 502(b)(1), and places the Interest claim in dispute under the Loan Agreement.[64]  As such, the burden shifts and Wilmington Trust has the ultimate burden in proving the validity and allowable amount of interest in its Proof of Claim.

The interest amount listed in the Proof of Claim was the $54,781.86 interest payment due to Wilmington Trust for the month that the Debtor filed bankruptcy.[65]  At trial, Wilmington Trust's witness, Jonathan Stanton ("*Mr. Stanton*"), when asked on cross-examination whether this interest payment was made stated, "it likely was."[66]  Further, Mr. Stanton testified that Debtor made all monthly payments at the contract rate.[67]  Wilmington Trust failed to produce any additional evidence or payment history reflecting that Debtor failed to make the Interest

---

[61] ECF No. 99.

[62] 8/15/2019 Hr. 15 ("Q: Each month, during the time that you've been in bankruptcy, have you instructed the management company to pay to your lender, Wilmington, an amount equal to the principle, the interest, and the reserve accounts called for by your loan agreement? A: Yes."); 12/11/2019 Hr. 76–77.

[63] *Id.* at 7–11.

[64] 11 U.S.C. § 502(b)(1) ("such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured…").

[65] 12/11/2019 Hr. 76: 7–11.

[66] 12/11/2019 Hr. 42: 6–10.

[67] 12/11/2019 Hr. 55: 18–24 ("Q: And prior to the filing of the bankruptcy had the Debtor made each of its required monthly payments . . . [t]hey were paying the contract rate? A: Yeah.").

payment.  Ultimately, Wilmington Trust failed to establish that its Interest claim in question was actually due under the Loan Agreement.[68]

Accordingly, the Court sustains Debtor's objection and disallows Wilmington Trust's claim to $54,781.86 in Interest pursuant to § 502(b)(1).

### C.  Default Interest

As to Wilmington Trust's claim of $796,961.02 in default interest ("*Default Interest*"), the Court must first determine whether a default occurred entitling Wilmington Trust to such a claim.   In support of its itemized charges, Wilmington Trust listed the following pre-petition defaults under the Loan Documents in its Proof of Claim, each of which must be evaluated:

### i.    Debtor's Failure to Comply with Cash Management Protocols

First, at the time Debtor entered into the Loan Agreement with BofA, the Holloman Corporation ("*Holloman*") was a large lessee at the Property.[69]   Under the Loan Agreement, certain events relative to Holloman would trigger certain rights and obligations under the Loan Documents.[70]   One such event, a "Holloman Renewal Event," occurs:

> the earlier of (x) the date on which Holloman gives notice that it will not be renewing the Holloman Lease *in accordance with its terms*, or (y) Holloman fails to renew and/or extend by the date required for renewal and/or extension under the Holloman Lease, or if no such date is required or specified in the Holloman Lease, the date that is twelve (12) months prior to the expiration of the Holloman Lease.

Should a Holloman Renewal Event occur, a "Cash Sweep Period" is commenced.[71] Upon commencement of a Cash Sweep Period, certain procedures and controls must be put in place by Debtor to account for how it spends its cash (collectively, "*Cash Management Protocols*").   First, Debtor is to open a "Deposit Account" and deposit all rents and other revenue

---

[68] *See* 11 U.S.C. § 502(b).
[69] 12/11/2019 Hr. 94: 22–25 ("Holloman is a prime target. They're a large lessor.").
[70] *See* Wilmington Trust Ex. 12 Bates 784.
[71] *See id.* ("Cash Sweep Period" shall mean the period commencing . . . [upon] (iv) Holloman Renewal Event…").

from the Property into the Deposit Account for the benefit of Wilmington Trust pursuant to §
10.1(a).[72]  Under § 10.2(a), Debtor is to instruct tenants to make rental payments directly into the
Deposit Account.[73]  Each business day, cash is to be swept from the Deposit Account into a
"Cash Management Account," where it would be allocated to subaccounts and ultimately
disbursed pursuant to that certain "Cash Management Agreement" dated September 19, 2014,
between Debtor, Wells Fargo, and BofA.[74]  Lastly, under § 9.5, Debtor is to deposit excess cash
into an "Excess Cash Reserve Account" as additional security for the Loan.[75]  In sum, Debtor
must abide by the Cash Management Protocols in §§ 10.1, 10.2, and 9.5 upon the
commencement of a Cash Sweep Period.

Section 11.1 of the Loan Agreement sets forth what constitutes an Event of Default.[76]
Contained within the enumerated Events of Default is § 11.1(a) of the Loan Agreement whereby
the Debtor is in default if any portion of the debt to Wilmington Trust is not paid within 5 days
after the due date.[77]  Wilmington Trust argues that a Holloman Event followed by Debtor's

---

[72] Wilmington Trust Ex. 12, Loan Agreement § 10.1(a) ("At the beginning of a Cash Sweep Period, Debtor is to
open a "Deposit Account" and to instruct tenants to make rent payments directly into the Deposit Account for the
benefit of Wilmington Trust.").

[73] *Id.* at Loan Agreement § 10.2(a) ("(a) Borrower covenants that: (i) Upon the commencement of a Cash Sweep
Period, Borrower shall notify and advise each Tenant under each Lease to make all payments of Rents or any other
item payable under such Leases directly into the Deposit Account…").

[74] *Id.* at Loan Agreement § 10.1(b) ("Borrower acknowledges and confirms that, pursuant to the Cash Management
Agreement, an Eligible Account with Cash Management Bank into which funds in the Deposit Account shall be
transferred pursuant to the terms of Section 10.2(b) hereof (such account, the sub-accounts thereof, all funds at any
time on deposit therein and any proceeds, replacements or substitutions of such account or funds therein, are
collectively referred to herein as the "Cash Management Account") shall be established.").

[75] *Id.* at Loan Agreement § 9.5 ("Borrower shall establish on the date hereof an Eligible Account with Lender or
Lender's agent into which Borrower shall deposit all Excess Cash on each Payment Date during the continuation of
a Cash Sweep Period (the "Excess Cash Reserve Account").  Amounts so deposited shall hereinafter be referred to
as the "Excess Cash Reserve Funds".  Excess Cash Reserve Funds shall be held by Lender as additional security for
the Loan; provided, however, during the continuance of an Event of Default, Lender shall have the right, but not the
obligation, in its sole discretion to apply Excess Cash Reserve Funds to the Debt…").

[76] *See id.* at Loan Agreement § 11.1.

[77] *Id.* at Loan Agreement § 11.1(a) ("if any portion of the Debt is not paid prior to the fifth (5th) day following the
date the same is due or if the entire Debt is not paid on or before the Maturity Date.").

failure to abide by Cash Management Protocols during a Cash Sweep Period constituted an Event of Default under § 11.1(a).

According to Wilmington Trust, a Holloman Renewal Event occurred on July 31, 2017, when Holloman failed to indicate that it would renew the Holloman Lease.[78]  As the argument goes, Debtor agreed to give Holloman several months of occupancy at no charge and the parties subsequently entered into a new leasing arrangement.[79]  Debtor, on the other hand, contends that a Holloman Renewal Event did not occur because Holloman did renew the lease.[80]  At trial, Dr. Testa testified that:

> So, Holloman came to us and said: Look, you know, we like it -- we like it here, we'd like to stay but we need to modify our lease. And that's the best deal that we were able to work out. We allowed them to give up a floor and a half of space. We reduced the rent on the remaining floor and a half that they occupied. We gave them [tenant improvements] and we gave them seven months of rent abatement. So, the deal was an absolute horrible killer deal for us. But the alternative was: We'd lose Holloman as a tenant.[81]

The Loan Agreement explicitly states that a Holloman Renewal Event occurs if Holloman "will not be renewing the Holloman Lease *in accordance with its terms*."  The Court determines that a Holloman Renewal Event did occur because seven months of rent abatement and less space leased at a lower rate is certainly not a renewal in accordance with the terms under which Holloman was previously leasing from Debtor.  As such, the Court finds that a Cash Sweep Period was triggered.  Debtor should have adhered to Cash Management Protocols and deposited excess cash into an Excess Cash Reserve Account, opened a Deposit Account and

---

[78] Wilmington Trust Ex. 5.
[79] ECF No. 113.
[80] 12/11/2019 Hr. 92: 3–10.
[81] 12/11/2019: 94: 1–11.

Cash Management Account, and advised each tenant to make all payments of rents payable under such leases directly to the Deposit Account.[82]

Debtor, nevertheless, argues that no competent evidence was put on to support that a default ever occurred.[83]   At trial, Dr. Testa testified that while he did not believe that the Cash Sweep Period was triggered, he made efforts to establish the Cash Management Account, but it was Wilmington Trust that prevented the account from being established.[84]   Further, Dr. Testa testified that he refused to establish a Deposit Account because he feared its impact with respect to tax liability and entity formation.[85]   Lastly, Dr. Testa acknowledged that tenants were not advised to make all payments of rents payable under such leases directly to the Deposit Account.[86]

While Debtor attempts to justify its non-compliance, no evidence was produced evidencing a modification to the Loan Agreement.   Debtor was required to follow the Cash Management Protocols described following the commencement of the Cash Sweet Period outlined in §§ 10.1, 10.2, and 9.5.[87]   Accordingly, the Court finds that Debtor's failure to adhere

---

[82] *See* Wilmington Trust Ex. 12, Loan Agreement §§ 9.5, 10.1, and 10.2.

[83] ECF No. 154.

[84] 12/11/2019 Hr. 107: 1–22. ("I filled out all the documents. I got things notarized. I sent [Secured Lender] all sorts of documentation, and it never got set up. Different people were in charge of handling it, and every time it went to a new person, it was like starting all over again, and it never got set up…").

[85] 12/11/2019 Hr. 107–109 ("Q: And you refused -- you instructed your children not to sign it. A: That's correct…").

[86] 12/11/2019 Hr. 106 ("Q: The lender has never directly received the rents from your tenants either, correct? A: "Correct.").

[87] *See* Wilmington Trust Ex. 12, Loan Agreement § 9.5 ("Borrower shall establish on the date hereof an Eligible Account with Lender or Lender's agent into which Borrower shall deposit all Excess Cash on each Payment Date during the continuation of a Cash Sweep Period (the "Excess Cash Reserve Account"). Amounts so deposited shall hereinafter be referred to as the "Excess Cash Reserve Funds". Excess Cash Reserve Funds shall be held by Lender as additional security for the Loan; provided, however, during the continuance of an Event of Default, Lender shall have the right, but not the obligation, in its sole discretion to apply Excess Cash Reserve Funds to the Debt in such order and in such manner as Lender shall elect…"); *Id.* at Loan Agreement § 10.1 ("Borrower covenants that it shall, upon the commencement of a Cash Sweep Period, promptly establish and thereafter maintain, pursuant to the Deposit Account Control Agreement, an Eligible Account with Deposit Bank into which Borrower shall, and shall cause Manager to, deposit or cause to be deposited, all Rents and other revenue from the Property (such account, all funds at any time on deposit therein and any proceeds, replacements or substitutions of such account or funds therein, are collectively referred to herein as the "Deposit Account"…"); *Id.* at Loan Agreement § 10.2 ("Borrower

to the terms of the Loan Agreement to which Debtor was bound constitutes an Event of Default pursuant to § 11.1(a) of the Loan Agreement.[88]

ii.     *Additional Events of Default for Violating Cash Management Protocols*

Further, Wilmington Trust alleges that Debtor's failure to adhere to the Cash Management Protocols described above also constitutes an Event of Default under §§ 11.1(n) and (o) of the Loan Agreement.[89]   For an Event of Default to occur under § 11.1(n), Debtor's breach of § 10.2 of the Loan Agreement (i.e. Cash Management Protocols) must continue for two business days after notice from Wilmington Trust.[90]   For an Event of Default to occur under § 11.1(o), Debtor must be in default under a term, covenant or condition of the Loan Agreement for more than ten days after notice from Wilmington Trust.[91]   The Court has already found that Debtor was in violation of § 10.2, and failure to adhere to the Cash Management Protocols is a violation of the Loan Agreement.   As such, the only determination remaining with respect to an Event of Default under § 11.1(n) and (o) is the issue of timing.

In its Proof of Claim, Wilmington Trust contends that the date of the first occurrence of such Events of Default was August 1, 2017.[92]   However, Wilmington Trust failed to produce any evidence that Debtor was put on notice of an Event of Default under 11(o) and (n) prior to May

---

covenants that: (i) Upon the commencement of a Cash Sweep Period, Borrower shall notify and advise each Tenant under each Lease to make all payments of Rents or any other item payable under such Leases directly to the Deposit Account…").

[88] *See id.* at Loan Agreement § 11.1(a).

[89] ECF No. 113.

[90] *See* Wilmington Trust Ex. 12, Loan Agreement § 11.1(n) ("if Borrower breaches in any material respect any covenant contained in Section 10.2 hereof and such breach continues for two (2) Business Days after written notice from Lender.").

[91] *See id.* at Loan Agreement § 11.1(o) ("if Borrower shall continue to be in default under any other term, covenant or condition of this Agreement or any of the Loan Documents not covered in the foregoing clauses of this Section 11.1, for more than ten (10) days after notice from Lender…").

[92] Wilmington Trust Ex. 5.

17, 2018.[93]  On May 17, 2018, Debtor was provided a notice of default.[94]  At trial, Mr. Stanton

testified that he was not aware of any notices of default sent to Debtor prior to that date.[95]  As

such, under §§ 11.1(o) and (n), an Event of Default could not have occurred prior to two or ten

days after the May 17, 2018 notice from Wilmington Trust, respectively.  Accordingly, because

of Debtor's failure to adhere to the Cash Management Protocols, the Court finds that Events of

Default occurred under §§ 11(o) and (n) following the May 17, 2018 notice.

                    *iii.*    *Debtor's Alleged Failure to Pay the Property Manager*

        Next, Wilmington Trust claims that Debtor failed to pay the Property Manager amounts

due and owing under the Management Agreement in violation of §§ 5.14(a) and 6.1(a)(vii) of the

Loan Agreement and caused further Events of Default under §§ 11.1(g) and (d) of the Loan

Agreement.[96]  On July 18, 2018, Wilmington Trust notified Debtor that it had violated §§ 5.14(a)

and 6.1(a)(vii) of the Loan Agreement when it failed to pay the manager of the Property and

sought to replace management without giving prior notice to Wilmington Trust.[97]  Wilmington

Trust further asserts this default in response to Debtor's Claim Objection.[98]

---

[93] *See* Wilmington Trust Ex. 12, Loan Agreement § 11.1(n) ("if Borrower breaches in any material respect any covenant contained in Section 10.2 hereof and such breach continues for two (2) Business Days after written notice from Lender…"); *Id.* at Loan Agreement § 11.1(o) ("if Borrower shall continue to be in default under any other term, covenant or condition of this Agreement or any of the Loan Documents not covered in the foregoing clauses of this Section 11.1, for more than ten (10) days after notice from Lender in the case of any default which can be cured by the payment of a sum of money or for thirty (30) days after notice from Lender in the case of any other default…").

[94] *Id.*

[95] 12/11/2019 Hr. 52–55 ("Q: Okay. And do we have any default notices for any period earlier than May 17th of 2018? A: Not that I'm aware of…").

[96] *See* Wilmington Trust Ex. 12, Loan Agreement § 11.1(g) ("…Borrower, any managing member or general partner of Borrower, Guarantor, or any SPE Component Entity (if any) shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due…"); *Id.* at Loan Agreement § 11.1(d) ("if (i) Borrower breaches in any material respect any covenant with respect to itself or any SPE Component Entity (if any) contained in Article 6 or (ii) a Prohibited Transfer occurs…").

[97] *See* Wilmington Trust Ex. 5 Bates 437.

[98] ECF No. 113.

With respect to Debtor's failure to pay the Property Manager, Wilmington Trust has produced no evidence as what amount the Debtor owes and what services were performed. Wilmington Trust does no more than cite to § 5.14(a) in the Loan Agreement, the section generally covering "Property Management."[99]  In post-trial briefing to the Court, Wilmington Trust concedes in a footnote that Debtor cured the default with respect to a management fee.[100] Accordingly, the Court finds that no Event of Default occurred with respect to a failure to pay the Property Manager.

      *iv.*     *Debtor's Failure to Obtain Consent Prior to Replacing Management*

Next, Wilmington Trust claims that Debtor violated §§ 5.14(a) and 6.1(a)(vii) of the Loan Agreement when it sought to replace management without giving prior notice to Wilmington Trust.  It is undisputed that around July 2018, Debtor changed property management companies from Transwestern Property Company SW GP, LLC (d/b/a Transwestern) ("*Transwestern*") to Belvoir Real Estate Group, LLC ("*Belvoir*").[101]  Pursuant to § 5.14(d) of the Loan Agreement:

> [Debtor] shall not, without the prior written consent of [Wilmington Trust] (which consent shall not be unreasonably withheld, conditioned or delayed): (i) surrender, terminate or cancel, or consent to the surrender, termination or cancellation of, the Management Agreement or replace Manager or enter into any other management agreement with respect to the Property…[102]

In response to Wilmington Trust's claim, Debtor alleges that it had obtained prior consent to changing property management.  At trial, Dr. Testa testified on cross-examination that Wilmington Trust had approved the change in management from Transwestern to Belvoir.[103]

---

[99] *See* Wilmington Trust Ex. 12, Loan Agreement § 5.14.
[100] *See* ECF No. 155 ("the Debtor has since cured the Management Fee Default…").
[101] *See* 12/11/2019 Hr. 122; *see* Wilmington Trust Ex. 5 Bates 437.
[102] Wilmington Trust Ex. 12, Loan Agreement § 5.14(d).
[103] 12/11/2019 Hr. 122 ("Q: Did the lender approve the change? A: Yes. Yeah, they did. And then Belvoir took over…").

However, no evidence was produced by Debtor demonstrating any *prior written consent* of Wilmington Trust as called for under the Loan Agreement.

However, Mr. Stanton testified that Debtor did not obtain Wilmington Trust's consent under the Loan Agreement to change property managers.[104]   Supporting Wilmington Trust's position, a letter sent to Debtor on July 18, 2018 states that "[Wilmington Trust] is unable to grant its consent to the Management Change Request as submitted" by Debtor.[105]   A notice of default sent to Debtor on August 17, 2018, reasserts the notice made in the July 18, 2018 letter concerning the change in management.[106]   Additionally, it is persuasive that Debtor's counsel did not elicit any testimony on direct examination of Dr. Testa concerning the issue, nor did Debtor rebut the allegation that Debtor violated the Loan Agreement on the record.   Considering the weight of the evidence, the Court finds that Debtor violated § 5.14(a) of the Loan Agreement.

However, the Court does not find that a violation of § 5.14(a) constitutes an Event of Default under §§ 11.1(g) and (d).[107]   Section 11.1(d) is an Event of Default triggered by a violation of §§ 6.1 or 7.2(a).[108]   Section 11.1(g) is inapplicable to § 5.14 and makes no reference to any aspect of property management.[109]   As such, Wilmington Trust failed to demonstrate how a violation of § 5.14(a) triggers an enumerated Event of Default under § 11.1 of the Loan

---

[104] 12/11/2019 Hr. 31: 12-17 ("Q: And the lender -- the Debtor was required to obtain the lender's consent under the loan documents to change property managers? A: I believe so. Q: And they did not do that? A: I believe they did not, no.").
[105] Wilmington Trust Ex. 5 Bates 438.
[106] *Id.* at Bates 422.
[107] *See* Wilmington Trust Ex. 12, Loan Agreement § 11.1.
[108] *Id.* ("(d) if [Debtor] breaches in any material respect any covenant with respect to itself or any SPE Component Entity (if any) contained in Article 6 or (ii) a Prohibited Transfer occurs."); A "Prohibited Transfer" under the Loan Agreement "shall have the meaning set forth in Section 7.2(a) hereof.").
[109] *See* Wilmington Trust Ex. 12, Loan Agreement § 11.1(g).

Agreement, and the Court declines any invitation to speculate.[110]   Accordingly, the Court does

not find that Debtor was in default pursuant to §§ 11.1(g) and (d).[111]

> v.   *Debtor's Failure to Pay Outstanding and Unpaid Operating Expenses Relating to the Property and Unsecured Business Debt*

Next, Wilmington Trust alleges that Debtor caused an Event of Default when Debtor

failed to pay outstanding and unpaid operating expenses relating to the Property ("*OPEX*").[112]

Under § 6.1(a)(vii), Debtor covenants that it has not and will not "incur any debt, secured or

unsecured, direct or contingent (including guaranteeing any obligation), other than the Debt and

Permitted Debt."[113]   Section 11.1(d) of the Loan Agreement provides that it is an event of default

if "Borrower breaches in any material respect any covenant . . . contained in Article 6."[114]   To

prevail, Wilmington Trust must demonstrate that the OPEX was debt incurred and in which such

debt does not qualify as "Debt" or "Permitted Debt" under 6.1(a)(vii) of the Loan Agreement.[115]

As defined in § 1.1 of the Loan Agreement, "Debt" is "the outstanding principal amount

set forth in, and evidenced by, this Agreement and the Note together with all interest accrued and

unpaid thereon and all other sums due to [Wilmington Trust] in respect of the Loan under the

Note, this Agreement, the Mortgage or any other Loan Document."[116]   "Permitted Debt" is

defined in § 1.1 of the Loan Agreement as "trade and operational indebtedness incurred in the

ordinary course of business with trade creditors, provided such indebtedness is:

> (a) unsecured
> (b) not evidenced by a note

---

[110] The Court also finds § 6.1(a)(vii) inapplicable to the replacement of management under the clear language of the Loan Agreement.  The issue need not be discussed further.
[111] The Court need not address a violation of § 6.1(a)(vii) of the Loan Agreement with respect to Debtor's replacement of management because Wilmington Trust failed to cite or explain any violation of § 6.
[112] *See* Wilmington Trust Ex. 5.
[113] Wilmington Trust Ex. 12, Loan Agreement § 6.1(a)(vii).
[114] *Id.* at Loan Agreement Section § 11.1(d).
[115] *See id.*
[116] *Id.* at Loan Agreement § 1.1.

(c) on commercially reasonable terms and conditions, and
(d) due not more than sixty (60) days past the date incurred and paid on or prior to such
date
. . .
provided, however, [that] the aggregate amount of the indebtedness . . . shall not exceed
at any time two percent (2%) of the outstanding principal amount of the Note."[117]

Wilmington Trust contends that the unsecured business debt owed to Primary Lending LLC and Dr. Testa disclosed in the Debtor's schedules is not "Permitted Debt" and is an Event of Default under the Loan Documents.[118]  While Wilmington Trust makes a threadbare assertion in a notice of default letter on July 18, 2018 that OPEX amounts have come due, no further explanation has been provided.[119]

Wilmington Trust has wholly failed to consider the elements of Debt and Permitted Debt set forth in § 1.1 of the Loan Agreement.  For example, there is no evidence in the record that any debt incurred by Debtor was not a "trade and operational indebtedness incurred in the ordinary course of business."[120]  A notice letter in and of itself is not sufficient to determine whether a default has in fact occurred.  Because no evidence was produced demonstrating a breach under § 6.1, the Court finds no default under § 11.1(d) of the Loan Agreement.[121] Additionally, Wilmington Trust failed to demonstrate how § 5.14(a) of the Loan Agreement was applicable to its OPEX claim.

Wilmington Trust failed to authenticate any amounts alleged as OPEX, and there is no evidence in the record that the OPEX neither qualifies as "Debt" nor "Secured Debt."  The Court will not make guesswork out of Wilmington Trust's claims.  Accordingly, the Court finds that Wilmington Trust failed to produce any evidence that the OPEX did not qualify as "Debt" or

---

[117] *Id.*
[118] *See* ECF No. 155; *see* ECF No. 34.
[119] *See* Wilmington Trust Ex. 5 Bates 407.
[120] Wilmington Trust Ex. 12, Loan Agreement § 1.1.
[121] *Id.* at Loan Agreement § 11.1(d).

"Permitted Debt" as defined in the Loan Agreement,[122] and thus no default occurred with respect to OPEX.[123]

<em>vi.      Debtor's Failure to Discharge Mechanics' Liens</em>

Next, Wilmington Trust contends that Debtor's failure to discharge numerous mechanics' liens (collectively, the "*Mechanics' Liens*") encumbering the Property caused an Event of Default under § 11.1(i) of the Loan Agreement and § 3.5 of the Loan Agreement.[124]  An Event of Default pursuant to § 11.1(i) occurs:

> if the Property becomes subject to *any* mechanic's, materialman's or other Lien other than a Lien for any Property Taxes or Other Charges not then due and payable and the Lien shall remain undischarged of record (by payment, bonding or otherwise) for a period of thirty (30) days.[125]

Pursuant to § 3.5 of the Deed of Trust:

> (a) Borrower shall promptly pay when due all bills and costs for labor, materials, and specifically fabricated materials incurred in connection with the Property and never permit to exist beyond the due date thereof in respect of the Property or any part thereof any Lien or security interest, even though inferior to the Liens and the security interests hereof, and in any event never permit to be created or exist in respect of the Property or any part thereof any other or additional Lien or security interest other than the Liens or security interests hereof except for the Permitted Encumbrances. Borrower represents there are no claims for payment for work, labor or materials affecting the Property which are or may become a lien prior to, or of equal priority with, the Liens created by the Loan Documents.[126]

On August 17, 2018, a notice of default letter was sent to Debtor alleging that Debtor was in default as a result of its failure to timely pay for work at the Property.[127]  On November 8,

---

[122] *Id.* at Loan Agreement § 6.1(a)(vii).

[123] *See id.* at Loan Agreement § 11.1(d).

[124] *See* ECF Nos. 113, 155.

[125] Wilmington Trust Ex. 12, Loan Agreement § 11.1(i) (emphasis added).

[126] Wilmington Trust Ex. 13, Deed of Trust § 3.5.

[127] Wilmington Trust Ex. 5 Bates 422 ("Defaults and/or Events of Default have occurred and are continuing as a result of Borrower's failure to timely pay for work completed at the Property, as evidenced by the documents attached hereto as Exhibit 7 (the "Unpaid Lienable Amounts"). Servicer is aware that certain of the Unpaid Lienable Amounts are to be paid in connection with the pending request(s) for disbursement from the Replacement Reserve Account and the Leasing Reserve Account. which request(s) have not been funded due to the defaults and Events of

2018, the Debtor was sent another letter notice of default alleging that Events of Default have occurred pursuant to § 11.1(i) of the Loan Agreement and § 3.5 of the Deed of Trust as a result of mechanics' liens placed on the Property.[128]   Specifically, five mechanics' liens are enumerated in the letter:

1. Affidavit for Mechanic's and Materialman's Lien, filed by MLN Service Company against Transwestern Property Company, SWGT LLC dba Transwestern, acting as owner's agent for Northbelt, LLC, recorded on July 3, 2018 as Instrument No. RP—2018—299747 in the amount of $246,997.28 (the "*First Mechanic's Lien*");

2. Affidavit Claiming Mechanic's and Materialman's Lien, filed by Basic Builders, Inc. against Northbelt, LLC, recorded on July 18, 2018 as Instrument No. RP—2018—323559 in the amount of $51,164.29 (the "*Second Mechanic's Lien*");

3. Affidavit Claiming Mechanic's and Materialman's Lien, filed by Basic Builders, Inc. against Northbelt, LLC, recorded on July 18, 2018 as Instrument No. RP—2018—323 560 in the amount of $23,460.59 (the "*Third Mechanic's Lien*");

4. Affidavit for Mechanic's and Materialman's Lien, filed by Pearl's Master Floor, Inc. and Basic Builders, Inc. against Northbelt, LLC, recorded on July 19, 2018 as Instrument No. RP—2018-325993 in the amount of $8,910.50 (the "*Fourth Mechanic's Lien*"); and

5. Mechanic's and Materialman's Lien Affidavit, filed by TD Industries against Northbelt, LLC, recorded on August 15, 2018 as Instrument No. RP-20184373705 in the amount of $1,013.69, (the "*Fifth Mechanic's Lien*").[129]

Wilmington Trust attached copies of the Mechanics' Liens to its Proof of Claim.[130] Additionally, Debtor lists each of the aforementioned Mechanics' Liens in its Schedule D.[131] Debtor does not deny that Mechanics' Liens have been placed on the Property.[132]   However, Debtor argues that is not in default because multiple requests have been made to Wilmington Trust for reimbursement for "repairs made, tenant improvements already paid, for tenant

---

Default set forth herein.").
[128] *Id.* at Bates 504.
[129] Wilmington Trust Ex. 5 Bates 504–505.
[130] *Id.* at 479.
[131] ECF No. 34; Debtor's Ex. 7.
[132] *See* ECF No. 154.

improvements that were already paid, for leasing commissions paid, and for capital improvements that need to be done, . . . [t]hey demand money and it goes in but it never comes out."[133]   Dr. Testa testified that some expenses are extraordinary and cannot come out of operating expenses, so those expenses need to come out of the Reserve Escrow[134] held by Wilmington Trust, as was the case when this Court granted Debtor's motion to use reserve funds for repairs.[135]   Debtor alleges that the Mechanics' Liens are on the Property because Wilmington Trust has failed to make those payments from the Reserve Escrow.[136]

While Debtor attempts to justify its noncompliance and shift the blame to Wilmington Trust, it is undisputed that the Property is subject to mechanics liens that remain on the Property, in violation of the four corners of the Loan Agreement.[137]   On cross-examination, Dr. Testa testified that the First Mechanic's Lien has been paid, the Second, Third and Fourth Mechanics' Liens have not been paid, and he was not aware of the Fifth Mechanic's Lien.[138]   Debtor was placed on notice of the Mechanics' Liens on August 17, 2018, and November 8, 2018, and since the Property remained and still remains subject to the Second, Third, and Fourth Mechanics' Liens for a period greater than thirty (30) days, an Event of Default was triggered under § 11.1(i) of the Loan Agreement.   Debtor produced no evidence demonstrating why Wilmington Trust is responsible for the remaining Mechanics' Liens.

Section 9.7 of the Loan Agreement governs the disbursement of Reserve Escrow and sets forth the condition precedent for disbursement.[139]   Under this section, "in no event shall

---

[133] 12/11/2019 Hr. 85: 15–21; 12/11/2019 Hr. 86: 11–12.
[134] *See* Wilmington Trust Ex. 12, Loan Agreement § 9.7.
[135] 12/11/2019 Hr. 87: 7–10; *see* ECF No. 80.
[136] *See* Wilmington Trust Ex. 12, Loan Agreement § 9.7.
[137] *Id.* at Loan Agreement § 1.1.
[138] 12/11/2019 Hr. 117–120.
[139] *See* Wilmington Trust Ex. 12, Loan Agreement § 9.7.

[Wilmington Trust] be required to . . . disburse funds from any of the Reserve Accounts if an Event of Default exists."[140]   Pursuant to § 9.8(f) "[i]f any Event of Default is continuing, Borrower shall immediately lose all of its rights to receive disbursements from the Reserve [Escrow] until the earlier to occur of (i) the date on which such Event of Default is cured to Lender's satisfaction, or (ii) the payment in full of the Debt."[141]   Upon the continued Event of Default, Wilmington Trust has wide discretion in use of the Reserve Escrow.[142]

As previously found by this Court, continued Events of Default existed when Debtor failed to establish Cash Management Protocols following a Holloman Renewal Event.  As such, Wilmington Trust was not required to reimburse Debtor from the Reserve Escrow until those Events of Default were cured, which they were not.[143]   Further, the Court finds that the Mechanics' Liens are not a "Permitted Encumbrance" allowed under § 3.5 of the Deed of Trust, and Debtor is therefore in violation of the provision.[144]

Accordingly, the Court finds that Debtor triggered an Event of Default under § 11.1(i) of the Loan Agreement and is in violation of § 3.5 of the Deed of Trust.

---

[140] Wilmington Trust Ex. 12 Loan Agreement § 9.7(a). The "Reserve Accounts" referred to herein are synonymous with "Reserve Escrow" as defined in ECF No. 153.

[141] See Loan Agreement § 9.8(f).

[142] Id. ("Without limitation of the foregoing, during the continuance of any Event of Default, Lender may use and disburse the Reserve Funds (or any portion thereof) for any of the following purposes: (A) repayment of the Debt, including, but not limited to, principal prepayments and the prepayment premium applicable to such full or partial prepayment (as applicable); (B) reimbursement of Lender for all losses, fees, costs and expenses (including, without limitation, reasonable legal fees) suffered or incurred by Lender as a result of such Event of Default; (C) payment of any amount expended in exercising any or all rights and remedies available to Lender at law or in equity or under this Agreement or under any of the other Loan Documents; (D) payment of any item from any of the Reserve Accounts as required or permitted under this Agreement; or (E) any other purpose permitted by applicable Legal Requirements; provided, however, that any such application of funds shall not cure or be deemed to cure any Event of Default.").

[143] Id. at Loan Agreement § 9.8(f) ("If any Event of Default is continuing, Borrower shall immediately lose all of its rights to receive disbursements from the Reserve Accounts until the earlier to occur of (i) the date on which such Event of Default is cured to Lender's satisfaction, or (ii) the payment in full of the Debt.").

[144] Wilmington Trust Exhibit 13, Deed of Trust § 13.5 ("Permitted Encumbrances" shall mean collectively, (i) the Lien and security interests created by the Loan Documents, (ii) all Liens, encumbrances and other matters expressly set forth as exceptions in the Title Insurance Policy, (iii) Liens, if any, for Property Taxes imposed by any Governmental Authority not yet due or delinquent, and (iv) such other title and survey exceptions as Lender has approved or may approve in writing in Lender's sole discretion.").

### vii.    Debtor's Alleged Failure to Maintain Policies

Wilmington Trust alleged that Debtor failed to maintain policies constituting an Event of Default under § 11.1(c).  However, there is no evidence in the record to support this claim.[145] Wilmington Trust failed to assert any claim in furtherance of a default under § 11.1(c). According, the Court finds that Debtor did not trigger an Event of Default under § 11.1(c) of the Loan Agreement.

### viii.    Wilmington Trust's Default Interest Claim

Returning now to Wilmington Trust's claim of $796,961.02 in Default Interest, Debtor contends that Wilmington Trust is not entitled to Default Interest because there has been no showing that a material default occurred that would warrant Default Interest, and any Default Interest by its very nature would be considered unmatured and therefore disallowed pursuant to §502(b).[146]  Further, and in the alternative, Debtor asserts that any alleged default was cured, was not material, and should not result in the imposition of Default Interest.[147]  Lastly, the argument goes, the inclusion of Default Interest is a penalty against the Debtor and should not be collectable.[148]

Debtor's Claim Objection was sufficient to rebut the presumption of prima facie validity of Wilmington Trust's claim for Default Interest.  At trial, Debtor's representative Dr. Testa,

---

[145] Wilmington Trust alleged in its Proof of Claim: "Debtor failed to maintain the Policies as evidenced by written email correspondence from Debtor's counsel dated Friday, October 26, 2018 4:16 PM, causing the occurrence of an Event of Default under Section 11(c) of the Loan Agreement."
[146] ECF No. 99.
[147] Id.
[148] Id.

offered testimony and Debtor's counsel offered legal arguments under §502(b) placing the claim for Default Interest in dispute.[149]

Nevertheless, the evidence before the Court does not support disallowance of a claim for Default Interest.[150]   First, pursuant to § 2.4(b) of the Loan Agreement:

> Upon the occurrence and during the continuance of an Event of Default, interest on the outstanding principal balance of the Loan and, to the extent permitted by law, overdue interest and other amounts due in respect of the Loan shall accrue at a rate per annum equal to the Default Rate and all references in the Note, this Agreement or the other Loan Documents to the "Interest Rate" shall be deemed to refer to the Default Rate. Interest at the Default Rate shall be computed from the occurrence of the Event of Default…[151]

As such, the Loan Agreement expressly allows for Default Interest upon the event of a default.  Since Debtor triggered an Event of Default under §§ 11.1 (a), (o), (n), and (i) under the Loan Agreement, the commencement of Default Interest was valid.  Debtor failed to produce any evidence demonstrating that Default Interest should not have commenced upon an Event of Default.

Nevertheless, Debtor makes the legal argument that Wilmington Trust's claim should be disallowed under §502(b)(2) to the extent that the claim is for unmatured interest.[152]  Debtor does not explain how the Default Interest is unmatured.  Section 502(b)(2) of the Bankruptcy Code bars creditors from collecting "unmatured interest," which means interest that accrues post-petition.[153]  However, the Default Interest was collectable prior to the Petition Date.[154]  There is no evidence in the record further supporting Debtor's objection.

---

[149] *See In re High Std. Mfg. Co.*, 2016 Bankr. LEXIS 3701, *1; 12/11/2019 Hr. 64: 19 – 23 ("Q. There's no calculation attached to your proof of claim that shows how you calculated the default interest, isn't that correct? Attached to your proof of claim, there's no calculation? A. Okay.").

[150] 11 U.S.C. § 502(b)(2).

[151] Wilmington Trust Ex. 12.

[152] 11 U.S.C. § 502(b)(2).

[153] *In re Ultra Petroleum Corp.*, 913 F.3d 533, 544 (5th Cir. 2019); *see In re Burford*, 231 B.R. 913, 916 (Bankr. N.D. Tex. 1999) ("Assuming § 502(b)(2) has been invoked by an objection to a proof of claim, the allowed amount will exclude post-petition interest accrued between the commencement of the case and plan approval.").

Accordingly, the Court overrules Debtor's objection to the extent it seeks disallowance of Wilmington Trust's claim for Default Interest as such is allowed pursuant to § 502(a). Nevertheless, Wilmington Trust's Proof of Claim, as filed, seeks Default Interest beginning August 1, 2017 through the Petition Date[155] and thus the Court sustains Debtor's Objection as it pertains to any Default Interest claimed by Wilmington Trust prior to May 17, 2018. Additionally, within 14 calendar days after entry of this Court's Memorandum Opinion and Order on the Court's docket Wilmington Trust must amend its proof of claim to reflect the amount and calculation of Default Interest accrued after May 17, 2018, through the Petition Date. Failure of Wilmington Trust to amend its claim in accordance with this Court's Order will result in the disallowance of the entire $796,961.02 in Default Interest without further order of this Court.

### D.  Late Charges

As to Wilmington Trust's claim of $5,144.18 in late charges ("*Late Charges*"), Debtor failed to object or reference the Late Charges in its Claim Objection.[156]  Instead, as seen in the principal discussion above, Debtor orally supplemented its objection to the Proof of Claim at trial when Debtor's counsel cross-examined Mr. Stanton on the issue.[157]  Nevertheless, because Debtor's objection and contentions regarding the Late Charges were made without objection by Wilmington Trust, the Court recognizes the objection as grounds for disallowance under § 502(b)(1).[158]

---

[154] *In re Burford*, 231 B.R. at 916.
[155] Wilmington Trust Ex. 5.
[156] ECF No. 99.
[157] 12/11/2019 43 Hr. 3–10.
[158] 11 U.S.C. § 502(b).

During cross-examination of Mr. Stanton, when asked how the figure was calculated, Mr. Stanton replied, "I'm not sure."[159]   However, upon redirect, Mr. Stanton testified that "because there's a five day grace period in the loan documents and the payment -- it looks like the January payment was paid late, after those five days lapsed, that per the loan agreement it's four percent of the monthly payment amount, which equates to $5,144.18."[160]   The policy regarding the Late Charges is also found in the Loan Agreement.[161]   Nevertheless, Debtor contends in its post-trial briefing that no competent evidence was put on to support this figure and the claim should be reduced accordingly.[162]

In *In re Bryant,* the bankruptcy court found that the debtor failed to produce any evidence having a probative force equal to that of the creditor's claim sufficient to defeat the presumption of validity of the claim where the debtor's case-in-chief consisted principally of Debtor's testimony that he did not agree with the claim calculation (without giving any specific reasons for his disagreement); and his counsel's unsuccessful attempt to discredit the calculation.[163] Similarly, Debtor's objection entirely relies on the testimony at trial and a bare allegation that "no competent evidence was put on to support this figure."[164]   Debtor's objection to the form and content of Wilmington Trust's Late Charges claim does not, by itself, establish grounds for disallowance of the claim.[165]

The Court therefore finds that Debtor failed to produce evidence sufficient to rebut the presumption of validity and establish that the Late Charges claim applied to any grounds for

---

[159] 12/11/2019 43 Hr. 3–10.
[160] 12/11/2019 Hr. 61: 2–6.
[161] Wilmington Trust Ex. 5; Wilmington Trust Ex. 12 Bates 799 ("(e) Late Payment Charge. If any principal, interest or other payment due under the Loan Documents (other than the outstanding principal amount of the Loan due on the Maturity Date) is not paid by Borrower on or prior to the fifth (5th) day after the date the same is due…").
[162] ECF No. 154.
[163] *In re Bryant*, 600 B.R. 533, 536 (Bankr. N.D. Tex. 2019).
[164] ECF No. 154.
[165] *See* FED. R. BANKR. P. 3001; *see also In re DePugh*, 409 B.R. at 97–98.

disallowance pursuant to § 502(b).[166]   Accordingly, the Court overrules Debtor's objection and finds that, the $5,144.18 in Late Charges is allowed pursuant to § 502(a).

### E.  Default Prepayment Premium

As to Wilmington Trust's claim of $1,612,354.00 in default prepayment premium ("*Default Prepayment Premium*"), the claim must be evaluated in accordance with the findings of default listed above.   Wilmington Trust in its Proof of Claim asserts that on or about November 8, 2018, Wilmington Trust gave written notice to Debtor of its intention to accelerate the Debt pursuant to that certain Notice of (i) Events of Default and Demand for Immediate Cure; (ii) Intent to Accelerate Debt; and (iii) Reservation of Rights and Remedies notifying Debtor, inter alia, that if it failed to fully cure the Events of Default that then existed on or before November 16, 2018, that the Debt would be accelerated.[167]   Additionally, Wilmington Trust alleges that Debtor failed and refused to cure the Events of Default on or before November 16, 2018.   On December 13, 2018, Wilmington Trust gave written notice to Debtor that the entire Debt was immediately due and payable pursuant to that certain Notice of Acceleration of Debt and Reservation of Rights and Remedies.[168]   The entire Debt, Wilmington Trust argues, was due and owing prior to the Petition Date.[169]

Debtor asserts in its Claim Objection that Wilmington Trust is not entitled to the Default Prepayment Premium because (i) there has been no showing that a material default occurred that would warrant an imposition of the Default Prepayment Premium; and (ii) any Default Prepayment Premium, by its very nature, would be considered unmatured and therefore

---

[166] 11 U.S.C. § 502(b).
[167] Wilmington Trust Ex. 5 (Proof of Claim Ex. G).
[168] *Id.* (Proof of Claim Ex. I).
[169] *Id.*

disallowed pursuant to § 502(b).[170]  In the alternative, Debtor asserts that any alleged default was cured, was not material, and should not result in the imposition of the Default Prepayment Premium.[171]  Further, Debtor contends that the inclusion of the Default Prepayment Premium is a penalty against the Debtor and should not collectable.  Debtor's objection to Wilmington Trust's claim to Default Interest and a Default Prepayment Premium are nearly identical.

The Court finds that Debtor produced evidence sufficient to rebut Wilmington Trust's presumption with respect to its claim regarding the Default Prepayment Premium.  Debtor, through its claim objection and Dr. Testa's testimony at trial, offered factual and legal arguments based upon the contents of the claim placing the claim into legal dispute under § 502(b).[172]  Thus, the ultimate burden shifts back to Wilmington Trust to prove that its claim to $1,612,354.00 in Default Prepayment Premium should be allowed.  Section 2.6(c) of the Loan Agreement states:

> If, after the occurrence and during the continuance of an Event of Default, [Wilmington Trust] shall accelerate the Debt and Borrower thereafter tenders payment of all or any part of the Debt, or if all or any portion of the Debt is recovered by [Wilmington Trust] after such Event of Default, such payment shall be deemed an attempt to circumvent the prohibition against prepayment set forth in this Agreement and Borrower shall pay to [Wilmington Trust], in addition to the Debt, (i) the amount of interest which would have accrued thereon through the end of the month in which payment is tendered if such payment is not made on a Payment Date, and (ii) an amount equal to the greater of (A) five percent (5%) of the portion of the principal balance of the Debt, and (B) the amount which, when added to the principal balance of the Debt, will be sufficient to purchase Defeasance Collateral (as adjusted based on the portion of the Loan being prepaid).

On November 8, 2018, Wilmington Trust sent a letter notifying Debtor of its intent to accelerate the Loan Agreement for the occurrence and continuance of Events of Default pursuant

---

[170] ECF No. 99.
[171] *Id.*
[172] *See* Wilmington Trust Ex. 5; 12/11/2019 Hr. 79.

to §§ 11(a), (o), and (i) of the Loan Agreement.[173]   The Court already found that Debtor was in default under the aforementioned sections of the Loan Agreement.   On December 18, 2018, Wilmington Trust sent its notice of acceleration after Debtor failed to cure the Events of Default.[174]   When Debtor thereafter tendered its next payment to Wilmington Trust, the Debt was accelerated.[175]   As such, Wilmington Trust was entitled to collect a Default Prepayment Premium under § 2.6(c) of the Loan Agreement.   In its post-trial briefing to the Court, Debtor contends that the Default Prepayment Premium should be disallowed pursuant to § 502(b)(5).[176]   However, under § 502(b)(5), a proof of claim is not allowed if such claim is for a debt that is unmatured on the date of the filing of the petition *and* that is excepted from discharge under § 523(a)(5).[177]   Section 523(a)(5) is inapplicable in this case because the statute pertains to debt for a domestic support obligation.[178]   Accordingly, Debtor's objection grounded in § 502(b)(5) fails.

Moreover, Debtor asserts that Wilmington did not put on competent evidence to prove that the prepayment provision was valid under Texas state law or reasonable under federal law.[179]   In *In re Windmill Run Assocs., Ltd*, a lender had an allowable claim for prepayment penalty in a Chapter 11 case that had been filed by debtor-borrower following the acceleration of a note.[180]   In that case, the contract provided that the prepayment premium was due if, inter alia, the note was accelerated.[181]   Likewise, as with the Default Interest, the Default Prepayment Premium matured when the debt was permissibly accelerated under the Loan Agreement, which

---

[173] *Id.* (Proof of Claim Ex. L).
[174] *Id.* (Proof of Claim Ex. M).
[175] *Id.*; It is undisputed that Debtor maintained monthly payments at the contract rate.
[176] ECF No. 154.
[177] 11 U.S.C. § 502(b)(5) (emphasis added).
[178] 11 U.S.C. § 523(a)(5).
[179] *Id.*
[180] *In re Windmill Run Assocs., Ltd.*, 566 B.R. at 396.
[181] *Id.* at 451.

occurred before the Petition Date.[182]   Additionally, Debtor failed to cite any authority demonstrating that the terms of the Loan Agreement are invalid under Texas state or federal law. Prepayment penalties "are explicitly authorized by Texas statute and are valid 'whether payable in the event of voluntary prepayment, involuntary prepayment, acceleration of maturity, or other cause that involves premature termination of the loan.'"[183] Thus, the Loan was accelerated, and the Default Prepayment Premium became due pursuant to § 2.6(c). While Wilmington Trust produced evidence demonstrating its right to the Default Prepayment Premium, it failed to provide a satisfactory calculation of its amount.[184]

Accordingly, Debtor's objection is overruled to the extent it seeks disallowance of Wilmington Trust's claim to Default Prepayment Premium as such is allowed pursuant to § 502(a). Nevertheless, the Court sustains Debtor's objection as it pertains to the amount of the Default Prepayment Premium that should be allowed as Wilmington Trust failed to demonstrate, to this Court's satisfaction, how it arrived at the $1,612,354.00 amount. Therefore, within 14 calendar days after entry of this Court's Memorandum Opinion and Order on the Court's docket Wilmington Trust must amend its proof of claim to reflect a detailed calculation of the Default Prepayment Premium beginning December 18, 2018. Failure of Wilmington Trust to amend its claim in accordance with this Court's Order will result in the disallowance of the entire $1,612,354.00 in Default Prepayment Payment without further order of this Court.

---

[182] *In re Jack Kline Co., Inc.*, 440 B.R. 712 (Bankr. S.D. Tex. 2010) ("Proof of claim may include only prepetition claims.").

[183] *AMK 2000–A, L.L.C. v. Maliek*, 411 Fed.Appx. 703, 706 (5th Cir. 2011) (citing TEX. FIN. CODE ANN. § 306.005 (West 2017)); *see also Parker Plaza W. Partners v. UNUM Pension & Ins. Co.*, 941 F.2d 349, 356 (5th Cir. 1991) ("hold[ing] that Texas public policy is not violated solely because a prepayment premium results from lender acceleration").

[184] At trial, Wilmington Trust moved to admit Wilmington Trust Ex. 9 containing Mr. Stanton's Declaration in support of its claim. Debtor objected to Wilmington Trust Ex. 9, and the Court sustained Debtor's objection. Despite having Mr. Stanton on the witness stand, Wilmington Trust failed to elicit testimony detailing how Wilmington Trust calculated amounts set forth in its Proof of Claim.

### F. Special Servicing Fees

As to Wilmington Trust's claim of $12,051.40 in special servicing fees ("*Special Servicing Fees*"), Debtor asserts that Wilmington Trust has not shown that it has performed special services that were not contemplated and bargained for under the base servicing agreement.[185]  Further, Debtor argues that to the extent Wilmington Trust has performed "special services," there has been no showing that the fee is reasonable and necessary and not included simply to inflate the claim.[186]  Lastly, Debtor argues that the Loan Documents "do not call for such a fee" and that this is overhead that Wilmington Trust should absorb.[187]

In *In re Trevino*, the bankruptcy court held that the debtor's claim objection failed to plead any specific facts to rebut the presumption of prima facie validity where the debtor made a conclusory allegation that the proof of claim was not "reasonable or payable pursuant to the note and security agreement, and Texas law."[188]  Like the objection in that case, Debtor's objection is not grounded in any evidence and consists solely of conclusory allegations.  While Debtor's allegation that the Loan Documents "do not call for such a fee" makes an attempt at grounds for disallowance under § 502(b)(1),[189] Special Servicing Fees are expressly contemplated in § 17.6 of the Loan Agreement.[190]

Debtor has failed to produce any evidence that the terms of the Loan Agreement are unenforceable.[191]  As such, the Court finds that Debtor failed to produce sufficient evidence to rebut the prima facie validity presumption of Wilmington Trust's claim regarding its Special

---

[185] ECF No. 99.
[186] *Id.*
[187] *Id.*
[188] *In re Trevino*, 535 B.R. at 131.
[189] *In re DePugh*, 409 B.R. at 96; *see* 11 U.S.C. § 502(b).
[190] Wilmington Trust Ex. 12 Bates 871.
[191] *See* 11 U.S.C. § 502(b)(1).

Servicing Fees, much less prove that Wilmington Trust's claim falls under any grounds for disallowance pursuant to § 502(b).

Accordingly, Debtor's Claim Objection with respect to the Special Servicing Fees is overruled, and the $12,051.40 claim for Special Servicing Fees is allowed pursuant to § 502(a).

### G.  Payoff Fee

As to Wilmington Trust's claim of $1,000.00 as a payoff fee ("*Payoff Fee*"), Debtor contends that "Wilmington Trust is not entitled to a Payoff Fee because the loan has not been paid off," and the fee is included simply to inflate the claim amount.[192]   At trial, Debtor's principal, Dr. Testa, referred to the $1,000.00 Payoff Fee as "what banks do."[193]  Mr. Stanton, on the other hand, testified that the Payoff Fee was an administrative charge compensating Wilmington Trust for taking the time to generate the payoffs.[194]   Debtor provided no evidence, nor did it direct the Court to any portion of the Loan Agreement demonstrating that the Payoff Fee is impermissible which would support grounds for disallowance under § 502(b).[195]

Accordingly, the Court overrules Debtor's Objection.   Wilmington Trust's $1,000.00 claim with respect to the Payoff Fee is allowed pursuant to § 502(a).

### H.  Property Protection Advances

As to Wilmington Trust's claim of $25,165.06 in property protection advances ("*Property Protection Advances*"), Debtor asserts in its Claim Objection that Wilmington Trust is not entitled to Property Protection Advances because there has been no showing that Wilmington Trust actually advanced monies on behalf of the Debtor to warrant

---

[192] ECF No. 99.
[193] 12/11/2019 Hr. 80: 20–22.
[194] 12/11/2019 Hr. 59.
[195] 11 U.S.C. § 502(b).

reimbursement.[196]   Further, Debtor argues that to the extent Wilmington Trust advanced any monies on behalf of the Debtor, there has been no showing that the fee is reasonable and necessary and not suggested simply to inflate the claim.[197]   Lastly, in its Claim Objection, Debtor asserts that it has escrow accounts set up that would provide for these payments if they are legitimate.[198]   The Court finds that Debtor's objection to Property Protection Advances, although rather limited, is sufficiently grounded in the unenforceability of the Loan Agreement pursuant to 11 U.S.C. § 502(b)(1).[199]

In *In re 804 Congress, L.L.C.*, the bankruptcy court held that the creditor did not prove the validity of its claim for attorney's fees.[200]   In that case, the creditor listed "Other Fees— Legal: $83,326." with no additional documents detailing the legal fees in its proof of claim.[201] The bankruptcy court found that regardless of whether creditor's claim was entitled to prima facie validity, Debtor's objection that the fees and commission were not reasonable was enough because creditor merely asserted that the debtor owed fees and provided no evidence to support the amounts owed.[202]   The debtor's assertion that the amounts claimed by creditor were too high was "at least equal in probative force" to the evidence in the claims and the ultimate burden fell on creditor to prove its claim of attorney's fees.[203]

Here, both party's witnesses testified that Wilmington Trust's claim of "Property Protection Advances" is related to legal fees.[204]   In its Proof of Claim, Wilmington Trust lists $25,165.06 in Property Protection Advances in an itemized chart, but does not include additional

---

[196] ECF No. 99.
[197] *Id.*
[198] *Id.*
[199] 11 U.S.C. § 502(b)(1).
[200] *In re 804 Cong., L.L.C.*, 529 B.R. 213, 218 (Bankr. W.D. Tex. 2015).
[201] *Id.*
[202] *Id.*
[203] *Id.*
[204] 12/11/2019 Hr. 48: 12–21; 12/11/2019 81: 5–14.

documents detailing the legal fees for Property Protection Advances of any kind.[205]   Like the

debtor in *In re 804 Congress, L.L.C.*, Debtor's cursory objection that, inter alia, there has been

no showing that the fee is reasonable and necessary is at least equal in probative force to the

evidence in Wilmington Trust's Proof of Claim with respect to Property Protection Advances.

Therefore, the ultimate burden in establishing allowance of the Property Protection Advances

shifted to Wilmington Trust.

No evidence was produced by Wilmington Trust supporting the enforceability of

Property Protection Advances against the Debtor under the Loan Agreement.[206]   Without more,

Wilmington Trust's listing of the line item in the Proof of Claim unsupported by documentation

or a calculation is not enough to meet its ultimate burden in establishing allowance of the claim.

The Court will not afford a windfall to a creditor who otherwise has no claim but faces a cursory

objection by the debtor.   The Court finds that Wilmington Trust failed to provide evidence as to

what services were rendered or how the fees were calculated and where such fees were provided

for under the Loan Agreement and thus did not meet its ultimate burden in establishing

allowance of its claim to Property Protection Advances.

Accordingly, the Court sustains Debtor's Objection. Wilmington Trust's claim of

$25,165.06 in Property Protection Advances is disallowed under § 502(b)(1).

### I.   *Force Placed Insurance*

As to Wilmington Trust's claim of $1,142.96 in force placed insurance ("*Force Placed

Insurance*"), Debtor asserts that Wilmington Trust is not entitled to reimbursement for Force

Placed Insurance because there has been no showing that the Debtor failed to properly insure the

collateral; nor has there been a showing that a Force Placed Insurance policy was ever issued and

---

[205] Wilmington Trust Ex. 5.
[206] *See* 11 U.S.C. § 502(b)(1).

paid for by Wilmington Trust.  Further, if such a policy was obtained, Wilmington Trust cannot be reimbursed for such payment since the property has never not been insured.[207]  At trial, Dr. Testa testified that the Debtor has always maintained property insurance on the building, and the Property was fully covered and the loan was fully protected.[208]  As such, Dr. Testa asserted that there was never a need for additional insurance.  Further, on cross-examination, Mr. Stanton testified that he did not "know what that specific amount stemmed from, what exactly type of insurance or what the policy deficiency was that required that."[209]

Courts in the Fifth Circuit have used witness testimony to evaluate the validity of a Proof of Claim.[210]  Here, the Court finds that the testimony elicited by Debtor is sufficient in rebutting the Force Placed Insurance claim's prima facie validity under § 502(b)(1) because it places the enforceability of the claim under the Loan Agreement in dispute.[211]  As such, the ultimate burden shifts to Wilmington Trust to prove that the Force Placed Insurance claim should be allowed.

Mr. Stanton's inability to credibly testify regarding the basis for the Force Placed Insurance calculation or steps taken to prepare the Proof of Claim is a cause for concern.  Debtor was not effectively put on notice of the claim to which it was to object.   At trial, Wilmington Trust failed to put on any credible evidence demonstrating why it was owed $1,142.96 in Force Placed Insurance, or exactly how it became due under the Loan Documents.

Accordingly, the Debtor's Claim Objection is sustained.  Wilmington Trust's Force Placed Insurance claim of $1,142.96 is disallowed under § 502(b)(1).

---

[207] ECF No. 99.
[208] 12/11/2019 Hr. 81: 15–25.
[209] 12/11/2019 Hr. 49: 6–16.
[210] *In re Bryant*, 600 B.R. at 537 ("Neither [Debtor's] testimony that he did not agree with the amount of the Claim nor his counsel's attempts to undermine [Creditor's] testimony on cross-examination overcame [Debtor's] evidence on these three factors.").
[211] 11 U.S.C. § 502(b)(1).

### J.  Legal Fees

As to Wilmington Trust's claim of $92,615.50 in legal fees ("*Legal Fees*"), Debtor objects on the grounds that there has been no showing that the fee is reasonable and necessary, no showing that the fee accrued prepetition, and Debtor disputes such fees since—the argument goes—there was no default on the loan.[212]  Debtor contends that Wilmington Trust merely ran up fees trying to take the Debtor's property.[213]  At trial, Dr. Testa testified that he had "no idea" as to the breakdown of the $92,615.50 in Legal Fees.[214]  The Court recognizes Debtor's objection as grounds for disallowance under § 502(b)(1).[215]  For the same reasons as the Court's analysis with respect to Property Protection Advances,  Debtor's objection to Wilmington Trust's claim for Legal Fees is at least equal in probative force to the evidence in the Proof of Claim.[216] Therefore, the ultimate burden in proving allowance of its claim for Legal Fees shifted to Wilmington Trust.

In its Proof of Claim, Wilmington Trust listed "Legal Fees" in the amount of $92,615.50 with no additional documents detailing a breakdown or explanation of the fees.[217]  In its reply brief to Debtor's Claim Objection, Wilmington Trust stated in a footnote that it miscalculated the amount of fees in its Proof of Claim, and "the proper amount of unpaid legal fees as of the Petition Date is $88,622.61."[218]  At trial, Mr. Stanton's only explanation of the $92,615.50 was that the amount consists of "fees and costs incurred by attorneys."[219]  Mr. Stanton, despite having signed the Proof of Claim, did not know whether anything detailing the fees was ever attached to

---

[212] ECF No. 99.
[213] *Id.*
[214] 12/11/2019 Hr. 82: 2–5.
[215] 11 U.S.C. § 502(b)(1).
[216] *Id.*
[217] Wilmington Trust Ex. 5.
[218] ECF No. 113.
[219] 12/11/2019 Hr. 49: 17–21.

its filing.[220]   Additionally, Wilmington Trust neglected to mention the recalculated $88,622.61 at

trial.  No additional evidence was provided or admitted in support of its claim for Legal Fees.[221]

The Court will not entertain a claim for attorney's fees where there is no form of record as to

what services were performed and whether such fees are permissible under the Loan Agreement,

rendering that portion of the claim unenforceable.[222]  As such, the Court finds that Wilmington

Trust failed to provide evidence as to what services were rendered or how the fees were

calculated and where such fees were provided for under the Loan Agreement and thus did not

meet its ultimate burden in establishing allowance of its claim to Legal Fees.

Accordingly, Debtor's objection is sustained. Wilmington Trust's claim of $92,615.50 in

Legal Fees is disallowed pursuant to § 502(b)(1).

### K.  Interest on Advances

As to Wilmington Trust's claim of $122.44 in interest on advances ("*Interest on*

*Advances*"), because Debtor's Claim Objection has been sustained and Wilmington Trust's claim

of $25,165.06 in Property Protection Advances has been disallowed, the Court need not examine

the Interest on Advances any further.  The Court will not allow interest on a disallowed claim.

Accordingly, Debtor's Claim Objection is sustained. Wilmington Trust's claim of

$122.44 in Interest on Advances is disallowed under § 502(b)(1).

### L.  Liquidation Fee

---

[220] 12/11/2019 Hr. 49: 17–21 ("Q: Okay. Did you attach to your proof of claim anything that detailed 92,615.50 for legal fees? A: I don't know.").
[221] *See* Wilmington Trust Exs. 9, 10 (At trial, Wilmington Trust offered the declarations of Mr. Stanton and Christopher Fernandez in support of Wilmington Trust's response to Debtor's Claim Objection.  Debtor objected to the admission of these exhibits, and the Court sustained the objection.  As a result, exhibits 9 and 10 may not be considered in evaluating the Proof of Claim.).
[222] 11 U.S.C. § 502(b)(1).

As to Wilmington Trust's claim of $151,412.97 as a liquidation fee ("*Liquidation Fee*"), Debtor objects because the loan has not been liquidated, and the fee only serves as an add-on fee to inflate the claim without any showing of damages in this regard to warrant payment.[223]  The Court recognizes Debtor's objection as grounds for disallowance under § 502(b)(1).[224]  At trial, Mr. Stanton acknowledged that no calculation of the Liquidation Fee was attached to filed Proof of Claim.[225]  On cross-examination, when asked how the fee was calculated, he stated: "I believe that's one percent of the total amount of the total payoff amount, not including the [L]iquidation [F]ee line item."[226]  However, Mr. Stanton was not able to adequately explain why the Liquidation Fee was applicable under the Loan Documents.  He stated that the Liquidation Fee is applicable not just in the event of a liquidation, but if the loan is being paid off.[227]  When asked if anyone was paying off the loan, he did not know.[228]  The Court finds that the evidence presented by Debtor is of a probative force equal to that of Wilmington Trust's claim sufficient to defeat the presumption of validity of the Liquidation Fee claim.  Wilmington Trust was effectively put on notice as to what Debtor was objecting to.

Once the burden shifted, Wilmington Trust failed to meet its ultimate burden in establishing allowance of the claim for the Liquidation Fee because there is no probative evidence before the Court illustrating why the Liquidation Fee is applicable under the Loan Documents, and no additional evidence was offered by Wilmington Trust at trial.  Wilmington Trust failed to demonstrate where in the Loan Agreement a Liquidation Fee is applicable to an acceleration of the Debt.  Further, Dr. Testa testified that he has not proposed to liquidate the

---

[223] ECF No. 99.
[224] *See* 11 U.S.C. § 502(b)(1).
[225] 12/11/2019 Hr. 65: 22–25.
[226] 12/11/2019 Hr. 50: 5–19.
[227] *Id.*
[228] *Id.*

Property, pay off the loan early, or anything of the nature that would require a Liquidation Fee.[229]  Lastly, the Court finds it persuasive that Wilmington Trust's post-trial brief is silent as to the Liquidation Fee.[230]

Accordingly, Debtor's Objection is sustained. Wilmington Trust's Liquidation Fee claim in the amount of $151,412.97 is disallowed pursuant to § 502(b)(1).

In summary, and pursuant to § 502(a), Wilmington Trust shall have an allowed claim in an amount not to exceed $15,060,084.74.[231]  The Court now turns its attention to valuation of Debtor's primary asset, the Property.

### c.  Debtor's Property Value Under § 506

Under § 506(a)(1), the value of a secured claim "shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest."[232]  In the Fifth Circuit, courts must consider (i) the purpose of the valuation, (ii) the proposed disposition or use of the property, which must be done (iii) in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.[233]  Specifically, as interpreted by the Fifth Circuit, § 506(a) commands that the collateral be valued in light of its proposed use by the reorganized debtor because the debtor is choosing to retain the collateral, rather than sell it or return it to the creditor.[234]

---

[229] 12/11/2019 Hr. 82: 6–10.
[230] *See* ECF Nos. 155, 159, 160.
[231] The final allowable amount of Wilmington Trust's  claim is to be determined after its Proof of Claim is amended in accordance with this Court's order.
[232] 11 U.S.C. § 506(a)(1).
[233] *Matter of Houston Reg'l Sports Network, L.P.*, 886 F.3d 523, 529 (5th Cir. 2018).
[234] *Id.* at 533; *see Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, 954 (1997).

The Code does not demand any particular method in valuing collateral, but instead leaves valuation questions to judges on a case–by–case basis.[235]  While the court may accept a valuation opinion in its entirety, the court may give weight only to those portions of a valuation that assist the court in its determination.[236]  As such, in determining the value of a property, bankruptcy courts have wide discretion in their approach and are not tied to any particular methodology.[237]  The valuation process is not an exact science, and the court must allocate varying degrees of weight depending upon the court's opinion of the credibility of the appraisal evidence.[238]

Before the Court are two competing valuations of the Property, and the Court must determine the value pursuant to § 506.  Debtor values the Property at $19,000,000.00 as listed in its schedules.[239]  At trial, Dr. Testa, Debtor's representative, reasserted under oath that he valued the property at $19,000,000.00.[240]  Additionally, Wilmington Trust confirmed Debtor's value of the Property when it also listed a value of $19,000,000.00 in its Proof of Claim.[241]

Nevertheless, Wilmington Trust changed its position when it subsequently filed its Motion For Relief, valuing the property at $7,600,000.00 supported by an appraisal report conducted by Mr. Scott Rando ("*Rando*") of Cushman & Wakefield of Texas, Inc ("*Appraisal*").[242]  Rando, a commercial real estate appraiser, testified as to his methods in the Appraisal.  Rando is a member of the Appraisal Institute and Senior Managing Director and Regional Partner within the Valuation & Advisory group of Cushman & Wakefield of Texas,

---

[235] *Matter of T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 799 (5th Cir. 1997).
[236] *In re Diamond Beach VP, LP*, 551 B.R. 590, 610 (S.D. Tex. 2016).
[237] *Id.* at 609 ("In the Fifth Circuit, a court conducting a valuation has broad leeway in its approach and is not tied to any particular methodology.").
[238] *In re Grind Coffee & Nosh, LLC*, 2011 WL 1301357, at *6 (Bankr. S.D. Miss. Apr. 4, 2011).
[239] ECF No. 34.
[240] 8/12/2019 Hr. 16: 7–9.
[241] Wilmington Trust Ex. 5.
[242] ECF No. 125-7.

Inc.[243]   Rando has 35 years of experience as a professional real estate appraiser and consultant and has previously been qualified as an expert by a sister court in the Southern District of Texas.[244]

Rando's Appraisal used two methods in valuing the Property: (i) sales comparison approach and (ii) income approach.[245]   Under the sales comparison approach, sale of comparable properties are adjusted for differences to estimate the value of the Property.[246]   Rando found three properties sold between 2017 – 2019  as comparable to the Property ("*Comparable Properties*").[247]   After analyzing the Comparable Properties and applying a cash flow differential to determine the market value upon stabilization of the Property, Rondo concludes that the Property's value is $7,700,000.00, or $36.10 per square foot.[248]

Rando's income approach forecasted the Property's revenue stream expenses and converted that to value through a yield capitalization (or discounted cashflow analysis) and direct capitalization technique.[249]   In direct capitalization, net operating income is divided by an overall capitalization rate to indicate an opinion of market value.[250]   In the yield capitalization method, anticipated future cash flows and a reversionary value are discounted to an opinion of net present

---

[243] Wilmington Trust Ex. 17.
[244] *In re SBPM Holdings, Inc.*, No. 10-80310-G3-11, 2010 WL 4976952, at *1 (Bankr. S.D. Tex. Dec. 2, 2010).
[245] 12/11/2019 Hr. 189: 4–17.
[246] *Id.* ("We used the Sales Comparison Approach to estimate the Prospective Market Value Upon Stabilization of the subject property. From that value, we make certain adjustments to derive the As-Is Market Value. Prior to adjustments the comparable improved sales reflect unit prices ranging from $27.61 to $80.00 per square foot with an average pre adjusted price of $60.08 per square foot. After adjustments the comparable improved sales reflect unit prices ranging from $62.11 to $65.36 per square foot with an average adjusted price of $63.82 per square foot.").
[247] *Id.* ("We used the Sales Comparison Approach to estimate the Prospective Market Value Upon Stabilization of the subject property. From that value, we make certain adjustments to derive the As-Is Market Value. Prior to adjustments the comparable improved sales reflect unit prices ranging from $27.61 to $80.00 per square foot with an average pre adjusted price of $60.08 per square foot. After adjustments the comparable improved sales reflect unit prices ranging from $62.11 to $65.36 per square foot with an average adjusted price of $63.82 per square foot.").
[248] *Id.*
[249] *Id.*
[250] *Id.*

value at a chosen yield rate (internal rate of return).[251]  A summary of the valuation indices under the income approach, as included in Rando's Appraisal, are listed below:

| INCOME CAPITALIZATION APPROACH | |
|---|---|
| | |
| **Yield Capitalization** | |
| Projection Period: | 11 Years |
| Holding Period: | 10 Years |
| Terminal Capitalization Rate: | 9.25% |
| Internal Rate of Return: | 10.50% |
| Indicated Value: | $7,600,000 |
| Per Square Foot (NRA): | $35.63 |
| | |
| **Direct Capitalization** | |
| Net Operating Income (stabilized): | $146,868 |
| Capitalization Rate: | 10.50% |
| Preliminary Value: | $14,158,076 |
| LESS Cash Flow Differential | ($6,200,000) |
| Indicated Value Rounded: | $8,000,000 |
| Per Square Foot (NRA): | $37.51 |
| | |
| **Income Capitalization Approach** | |
| Indicated Value: | $7,600,000 |
| Per Square Foot (NRA): | $35.63 |

Reconciling the valuation methodologies, Rando gives the most weight to the income approach, specifically the yield capitalization method.  Rando concludes in the Appraisal that the market value of the Property as of September 6, 2019, is $7,600,000.00.[252]

In light of Rando's background, experience, and testimony at trial, the Court finds Rando's Appraisal credible.  However, while Rando's valuation serves as a starting point for the valuation, the Court is not inclined to fully accept Rando's Appraisal.  Adjustments must be

---

[251] *Id.*
[252] *Id.*

made to more accurately reflect the value under the proposed use by the reorganized debtor pursuant to § 506(a).[253]  As such, the Court determines its own valuation of the Property.

In *In re Diamond Beach VP, LP*, the district court affirmed the bankruptcy court's ruling where after rejecting a "cost" approach method utilized by experts, the bankruptcy court relied on evidence presented through experts to value land using what it characterized as a "modified income" approach.[254]  Similarly, in a case cited by *In re Diamond Beach VP, LP*, the bankruptcy court accepted a portion of an expert's valuation opinion, but determined its own valuation where the expert placed an undue emphasis on certain alleged defects of the property in reaching its conclusion.[255]

Here, under the sales comparison approach, Rando compares the Property to three Comparable Properties, two of which were sold in 2017.[256]  In light of the foreseeable economic circumstances and conditions of the market, the Court does not put as much stock in the sale of a Comparable Property sold two to three years prior to this valuation.  Courts have rejected the sales comparison approach on similar grounds.[257]

As to Rando's methods under the income approach, he testified that the Appraisal does not project "what this owner will do [but instead] we're projecting a typical owner and operator."[258]  Rando further testified that before trial, he had no idea how much debt was on the Property and "none of the specific elements of the current ownership are dialed into [the Appraisal]."[259]  Because some of the specific elements of Debtor's ownership are not taken into

---

[253] 11 U.S.C. § 506(a).
[254] *In re Diamond Beach VP, LP*, 551 B.R. at 590.
[255] *In re Smith*, 267 B.R. 568, 576 (Bankr. S.D. Ohio 2001).
[256] Wilmington Trust Ex. 17.
[257] *In re SBPM Holdings, Inc.*, 2010 WL 4976952, at *2 ("The court finds that [expert's] opinion as to value carries little weight, in light of the age of the sales he considered to be comparable.").
[258] 12/11/2019 Hr. 196: 10–11.
[259] 12/11/2019 Hr. 13–24.

account, the Appraisal suffers from some unnecessary assumptions.  As pointed out by Debtor's counsel, Rando's calculation of the "management fees" in the Revenue and Expense Analysis under the direct capitalization approach assumes a 2.75 percent management fee rate when the management fee is under contract for 1.5 percent.[260]  Further, Rando testified that in calculating the operating expenses, he forecasted what "a buyer would project to be typical market expenses, whether or not they're consistent with historical levels [of the Debtor]."[261]

Like the district court in *In re Diamond Beach VP, LP* and the cases cited therein, the Court will adjust Rando's direct capitalization method to determine a valuation of the Property that more accurately reflects the Debtor's expenses.  Rando's direct capitalization method as included in the Appraisal is summarized below:

| DIRECT CAPITALIZATION METHOD | | | |
|---|---|---|---|
| **Market Value As-Is** | | | |
| | | | |
| **NET OPERATING INCOME** | | **$1,486,598** | **$6.97** |
| | | | **$/SF** |
| **Sensitivity Analysis (0.25% OAR Spread)** | | **Value** | **NRA** |
| Based on Low-Range of 10.25% | | $14,503,395 | $68.00 |
| Based on Most Probable Range of 10.50% | | $14,158,076 | $66.38 |
| Based on High-Range of 10.75% | | $13,828,819 | $64.84 |
| **Preliminary Value** | | $14,158,076 | $66.38 |
| **Rounded to nearest $100,000** | 9/6/2019 | **$14,200,000** | **$66.58** |
| | | | |
| **ADJUSTMENTS TO PRELIMINARY VALUE** | | | |
| **LESS Cash Flow Differential** | | ($6,200,000) | ($29.07) |
| Indicated Value | | $7,958,076 | $37.31 |
| **Rounded to nearest $100,000** | 9/6/2019 | **$8,000,000** | **$37.51** |

---

[260] 12/11/2019 Hr. 236: 6–13; Debtor's Ex. 18 Bates 1159.
[261] 12/11/2019 Hr. 237: 15–22.

In determining the "Net Operating Income" value, Rando used an estimation of operating expenses for the stabilization year in which the valuation was made.  Those expenses, as included in Rando's Appraisal, are as follows:

| SUMMARY OF REVENUE AND EXPENSES | | | |
|---|---|---|---|
| **Stabilized Year for Direct Capitalization:** | **Year Five** | | |
| | | | |
| **REVENUE** | Annual | $/SF | % of EGI |
| Base Rental Revenue | $2,141,967 | $10.04 | |
| Expense Reimbursement | $1,776,365 | $8.33 | |
| Parking Income | $0 | $0.00 | |
| Other Income | $12,002 | $0.06 | |
| **POTENTIAL GROSS REVENUE** | **$3,930,334** | **$18.43** | |
| Vacancy and Collection Loss | ($509,951) | ($2.39) | |
| **EFFECTIVE GROSS REVENUE** | **$3,420,383** | **$16.04** | **100.00%** |
| | | | |
| **OPERATING EXPENSES** | | | |
| Insurance | $120,025 | $0.56 | 3.51% |
| Utilities | $375,049 | $1.76 | 10.97% |
| Repairs and Maintenance | $480,099 | $2.25 | 14.04% |
| Janitorial | $210,965 | $0.99 | 6.17% |
| Management Fees | $94,061 | $0.44 | 2.75% |
| General & Administrative | $300,062 | $1.41 | 8.77% |
| Non-reimbursable Expenses | $24,005 | $0.11 | 0.70% |
| **Total Operating Expenses** | $1,604,266 | $7.52 | 46.90% |
| Real Estate Taxes | $329,519 | $1.54 | 9.63% |
| **TOTAL EXPENSES** | **$1,933,785** | **$9.07** | **56.54%** |
| | | | |
| **NET OPERATING INCOME** | **$1,486,598** | **$6.97** | **43.46%** |

Under Rando's method, the total expenses are $1,933,785.00.[262]  A more appropriate measure of "Total Expenses" can be calculated using Debtor's Monthly Operating Reports because they dial in the specific elements of Debtor's ownership, as opposed to market

---

[262] Wilmington Trust Ex. 17.

assumptions.[263]  As described in Debtor's post-trial briefing, when true operating expenses are isolated and the debt service and reserve payments are backed-out, the median total expenses per month are $115,267.00, or $1,383,204.00 per year.[264]  Subtracting this amount from "Effective Gross Revenue," the updated amount of "Net Operating Income" is $2,037,179.00.  Applying the updated net operating income to the 10.5 percent capitalization rate used by Rando, the preliminary value is now $19,401,704.80 (or $19,400,000.00 rounded to the nearest $100,000.00).  Next, adjusting the preliminary value by applying the cash flow differential of $6,200,000.00, the indicated value is $13,201,704.80 (or $13,200,000.00 rounded to the nearest $100,000.00).  Thus, in substituting Debtor's expenses under Rando's direct capitalization method, the Court values the Property at $13,200,000.00.  The Court next turns its attention to Wilmington Trust's Objection to Confirmation.

### d.  The Plan, Ballots, and Objection to Confirmation

#### 1.  Debtor's First Amended Plan of Reorganization

Debtor's Amended Plan filed on June 13, 2019, contains the following classes of claims:[265]

| Class | Description | Amount |
|---|---|---|
| 1 | Allowed Secured Claims of Ad Valorem Taxing Authorities | 2018 Paid |

---

[263] Debtor's Ex. 9: *see In re Brentwood Grp. No. 1 Ltd.*, 2010 WL 2900327, at *8 (Bankr. S.D. Tex. July 21, 2010) (The bankruptcy court declined the expert's invitation to appraise the property using the debtor's monthly operating reports in applying the direct capitalization approach because it excluded the debtor's holiday shopping season. In contrast, Debtor's monthly operating expenses are not defective in that same sense because there is no evidence in the record that the Property was operating under any peculiar circumstances.).

[264] Debtor's Ex. 9; ECF No. 154.

[265] ECF No. 88.

| 2 | Allowed Secured Claim of Wilmington Trust, N. A. | $15,385,325.53[266] |
| 3 | Allowed Mechanic's Lien Claimants | $782,387.00[267] |
| 4 | Allowed General Unsecured Claims | $700,000.00 |
| 5 | Equity Interests | |

The Amended Plan proposes to pay the Class 2 claim in an amount to be determined by this Court in full and in accordance with the original loan documents with interest at the non-default rate. Class 3 claimants will be paid in full in 12 equal monthly installments commencing on the fifteenth day of the first month following the Effective Date of the Amended Plan. Class 4 claims are to be paid in full at 2% interest with 48 monthly installments commencing on the first day of the month following the Effective Date. Class 5 claimants are to retain their equity interests in the Testa Family Limited Partnership, II. The Amended Plan is to be funded by the continued operations of the Debtor's rental of the Property.

## 2. Balloting

The following creditors cast ballots on the Amended Plan:[268]

| Class | Creditor | Vote |
|---|---|---|
| 1 | Allowed Secured Claims of Ad Valorem Taxing Authorities | |
| 2 | Allowed Secured Claim of Wilmington Trust, N. A. | |
| 3 | Allowed Mechanic's Lien Claimants | Accepted |
| 4 | Allowed General Unsecured Claims | Accepted[269] |
| 5 | Equity Interests | |

[266] As written by Debtor, "[t]his amount is disputed. The principal amount is $12,632,574.14. The Secured Creditor has added additional amounts to the loan which are disputed: $54,781.86 in interest, $769,961.02 in pre-petition default interest, $5,144.18 in late fees, $1,612,354.00 in default prepayment premium, special servicing fees of $12,051.40, $1,000 payoff fee, $25,165.06 in property protection advances, $1,142.96 in forced place insurance, $92,615.50 in prepetition legal fees, interest on pre-petition advances $122.44 and liquidation fee $151,412.97 totaling disputed amounts in the amount of $2,752,751.40."

[267] Debtor's Schedule D reflects a total of $422,997.75 in Class 3 claims.

[268] ECF No. 104.

[269] The only Class 4 claimant to submit a ballot in favor of the Amended Plan was Don Testa, Debtor's representative. In its Objection to Confirmation, ECF No. 96, Wilmington Trust states that "[t]he Debtor scheduled a $300,000 loan made by *insider* Donald Testa…" (emphasis added). While the issue was referenced in its pleadings, Wilmington Trust presented no evidence as to whether Dr. Testa is an "insider" pursuant to 11 U.S.C. §§ 101(31)(E), 101(2)(A). As such, the Court need not further discuss the matter at this time.

### 3.  Requirements for Plan Confirmation

To confirm a proposed plan of reorganization, the plan proponent must demonstrate that the plan meets the requirements of § 1129(a) of the Bankruptcy Code by a preponderance of the evidence.[270]   Alternatively, if the requirement of acceptance by all impaired classes—§ 1129(a)(8)—is not met, confirmation can still be achieved if the plan "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims . . . that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)."[271]

Wilmington Trust asserts that Debtor's Amended Plan fails to comply with two requirements under § 1129(a).[272]   First, Wilmington Trust contends that the Amended Plan has not been proposed in good faith pursuant to § 1129(a)(3).   Second, under § 1129(a)(11), Wilmington Trust contends that the Amended Plan is not feasible.   These objections, if successful, foreclose consideration of the Amended Plan under § 1129(b), the so-called "cramdown" provision, because Northbelt would have failed to satisfy all applicable § 1129(a) requirements other than § 1129(a)(8) (acceptance by all classes or no impairment of any class), which is a condition to proceeding under § 1129(b).[273]   As such, the Court begins its analysis by addressing the two contested confirmation requirements Wilmington Trust advances in its Objection to Confirmation.

#### A.  Whether Debtor's Amended Plan is Proposed in Good Faith Under § 1129(a)(3)

Section 1129(a)(3) requires that a debtor's plan be "proposed in good faith and not by

---

[270] *Matter of T-H New Orleans Ltd. P'ship*, 116 F.3d at 801; *see* 11 U.S.C. § 1129(a).
[271] *In re Geijsel*, 480 B.R. 238, 253 (Bankr. N.D. Tex. 2012); *see* 11 U.S.C. § 1129(b).
[272] ECF No. 96.
[273] *See* 11 U.S.C. § 1129(b)(1).

any means forbidden by law."[274]   The good faith test means that a plan was proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected.[275]   Whether a Chapter 11 plan is proposed in good faith must be viewed in light of the totality of the circumstances and speaks more to the process of plan development than to the content of plan.[276]   A debtor's plan may satisfy the good faith requirement even though the plan may not be one which the creditors would themselves design and indeed may not be confirmable.[277]   The standard of proof required by the debtor to prove a Chapter 11 plan was proposed in good faith is by a preponderance of the evidence.[278]

As promulgated by the Fifth Circuit, the § 1129(a)(3) inquiry is ultimately fact-specific, fully empowering the bankruptcy courts to deal with chicanery.[279]   In *In re Star Ambulance Serv., LLC*, this Court held that debtors proposed a plan in good faith where evidence was introduced which demonstrated that their cash flow projections would be sufficient to make the scheduled payments under the proposed plan and the monthly operating reports substantiated the Debtor's financial projections during the bankruptcy with the exception of higher expenses incurred in one month.[280]   There, the debtors also made necessary repairs to their property that would allow them a period of relief from expenses.[281]   While this Court found that the debtors' plan was not confirmable, their plan was proposed in good faith.[282]

In *In re Geijsel*, the bankruptcy court found that debtor's plan was submitted in good faith notwithstanding debtor's assumptions that the anticipated production of its product was

---

[274] 11 U.S.C. § 1129(a)(3).
[275] *In re Star Ambulance Serv., LLC*, 540 B.R. 251, 262 (Bankr. S.D. Tex. 2015).
[276] *See Matter of T-H New Orleans Ltd. P'ship*, 116 F.3d at 802.
[277] *In re Briscoe Enter., Ltd., II*, 994 F.2d 1160, 1167 (5th Cir.1993).
[278] *Matter of T-H New Orleans Ltd. P'ship*, 116 F.3d at 802.
[279] *In re Vill. at Camp Bowie I, L.P.*, 710 F.3d 239, 248 (5th Cir. 2013).
[280] *In re Star Ambulance Serv., LLC*, 540 B.R. at 262.
[281] *Id.*
[282] *Id.*

higher than could be justified historically, the forecasted expenses were lower than present amounts, and it assumed beginning cash of $1.1 million when the present amount was approximately a third of that.[283]   The bankruptcy court held that the creditor's good faith objection was based, in essence, on their aggregation of all things they say are wrong with the debtor's plan, and such issues were more properly addressed under the feasibility requirement.[284]

Here, Wilmington Trust's Objection to Confirmation lists a multitude of reasons for Debtor's lack of good faith in the filing of its Amended Plan including, inter alia, that this is a two party dispute with few other creditors, Debtor filed bankruptcy to forestall Wilmington Trust's suit against Debtor in the district court of Harris County ("*Harris County Suit*"), Debtor failed to address defaults, and "Debtor's financial projections are riddled with internal contradictions, are woefully under forecast, and fail to provide an accurate forecast of post-petition earning."[285]

Like the bankruptcy court in *In re Geijsel*, this Court finds that the grounds on which Wilmington Trust objects to the good faith requirement are essentially an aggregation of all of the things they find problematic with the Debtor's Amended Plan.  While the reasons cited by Wilmington Trust may implicate the good faith requirements under a liberal construction of § 1129(a)(3), such reasons more appropriately apply to the feasibility requirement under § 1129(a)(11).  It is not appropriate to read into the statutory language of § 1129(a)(3) a full-scale feasibility analysis when a plan may be proposed in good faith yet is still not feasible.  The focus of § 1129(a)(3) should be on a debtor's efforts and conduct in preparing the plan and the circumstances surrounding the filing of the plan itself.  While a plan's possibility of success is

---

[283] *In re Geijsel*, 480 B.R. at 256.
[284] *Id.*
[285] ECF No. 96.

relevant and may be considered, it does not alone drive the Court's determination under the "good faith" requirement.

As for evidence of Debtor's good faith, Debtor has filed two plans of reorganization before this Court.[286]   In its Amended Plan, Debtor does not ignore Wilmington Trust's allegations of default.[287]   Wilmington Trust sought $15,385,325.53 in its Proof of Claim to reflect the amount due as a result of Debtor's alleged defaults.   While Debtor disputed such amount, Debtor's Amended Plan proposes to pay the amount in full should the Court require, which it has in an amount not to exceed $15,060,084.74.[288]   At trial, Dr. Testa testified that the Amended Plan proposes to pay up to the full amount sought by Wilmington Trust in its Proof of Claim.[289]   While Debtor's defaults were in dispute, Debtor maintained both pre-petition and post-petition payments to Wilmington Trust at the contract rate.[290]   Further, Dr. Testa testified that Debtor is working with its management company to increase the rental revenue and decrease expenses.[291]   Notwithstanding the feasibility of Debtor's Amended Plan and any deficiencies that may exist, the record makes clear that Debtor's efforts in the process of plan development demonstrate a showing of good faith.

The Fifth Circuit has recognized that a single-asset debtor's desire to protect its equity can be a legitimate Chapter 11 objective.[292]   The fact that Debtor filed for Chapter 11 bankruptcy as a SARE alone does not demand a finding that the bankruptcy was not filed in good faith.   As

---

[286] ECF Nos. 53, 88.
[287] ECF No. 88.
[288] *Id.*; The final allowable amount of Wilmington Trust's claim is to be determined at a future date for the reasons discussed herein.
[289] 8/12/2019 Hr. 11: 7–13 ("Q: What if, however, the Court should determine that, in fact, there was a default, and that some or all of the amounts that the secured lender has requested be added to the loan balance, your plan does propose to pay those amounts, along with the regular payment that would be made to your secured creditor, is that correct? A: Yes, I'm aware of that.").
[290] 12/11/2019 Hr. 55: 18–24; Debtor's Ex. 9.
[291] 12/11/2019 Hr. 99: 1–4.
[292] *In re Village at Camp Bowie I, L.P.*, 710 F.3d at 248.

such, Debtor's active participation in the bankruptcy process and efforts to meet its objective in putting together a plan together that is confirmable are recognized by this Court.   While Wilmington Trust may take issue with Debtor's Amended Plan, there is no evidence that the Debtor failed to act with honesty and good intentions.

Accordingly, under the totality of the circumstances, the Court overrules Wilmington Trust's objection and finds that Debtor's Amended Plan was proposed in good faith pursuant to § 1129(a)(3).

### B. Whether Debtor's Plan Satisfies the Feasibility Requirement Under § 1129(a)(11)

Section 1129(a)(11) is commonly referred to as the "feasibility" requirement of confirmation.   A debtor's plan is feasible if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . . unless such liquidation or reorganization is proposed in the plan."[293]   Under the feasibility standard, a debtor must demonstrate that its plan offers a reasonable possibility of success by a preponderance of the evidence.[294]   The court need not require a guarantee of success.[295] Essentially, Debtor must be able to show that it can accomplish what it proposes to do, in the time period allowed, and on the terms set forth in the plan.   The bankruptcy court must make a specific finding as to feasibility after engaging in a peculiarly fact intensive inquiry that involves a case-by-case analysis, using as a backdrop the relatively low parameters articulated in the statute.[296]

When assessing feasibility, courts consider factors such as the adequacy of the debtor's

---

[293] 11 U.S.C. § 1129(a)(11).
[294] *See Matter of T-H New Orleans Ltd. P'ship*, 116 F.3d at 801.
[295] *In re Lakeside Glob. II, Ltd.*, 116 B.R. 499, 507 (Bankr. S.D. Tex. 1989).
[296] *Id.*; *In re Star Ambulance Serv., LLC*, 540 B.R. at 266.

capital structure, the earning power of the business, economic conditions, the ability of management, the probability of the continuation of the same management, and any other related matter.[297]   As the factors can be easily conflated and confused with one another, courts have discretion in weighing which factors to apply (or ignore) in each case.[298]   Therefore, this Court must now examine the Debtor's Amended Plan and consider its feasibility in light of the factors it deems most relevant.

### i.  Debtor's Capital Structure

The evaluation of debtor's capital structure entails an examination of the debtor's particular combination of debt and equity under the plan, looking favorably on debtors with available capital.[299]   Here, Debtor argues that under this factor the Court should give weight to the possibility that more favorable financing terms are available in the marketplace once the cloud of bankruptcy is lifted.[300]   The terms of the Loan Agreement call for debt service to be paid at a rate of 5.036 percent.[301]   At trial, Dr. Testa testified that the contract rate in the Loan Agreement is an "over-market" rate and he could refinance the Property in "the 3-1/2 to 4 range."[302]   The Court finds no merit in Debtor's unsubstantiated request and any reliance on this argument would be speculative at best.   Debtor's Amended Plan does not provide any details regarding its ability or intention to refinance the Loan, and no further support beyond Dr. Testa's testimony is offered regarding interest rates for similar loans.

Perhaps more troubling, the Wilmington Trust Loan matures on October 1, 2024

---

[297] *In re Two Streets, Inc.*, 597 B.R. 309, 317 (Bankr. S.D. Miss. 2019).
[298] *See In re Geijsel*, 480 B.R. at 257.
[299] *See id.*
[300] ECF No. 154.
[301] Wilmington Trust Ex. 12 Bates 785 ("Interest Rate" shall mean a rate per annum equal to five and thirty-six thousandths of a percent (5.036%).").
[302] 12/11/2019 Hr. 80: 10–19.

("*Maturity Date*").[303]   Under Debtor's Amended Plan, Debtor is to make plan payments for the next five years.  Thus, the maturity date of the Loan falls within the life of the Amended Plan, but Debtor fails to explain how the Loan balance will be satisfied at the Maturity Date.[304]   In order for a plan before this Court to be feasible, Debtor must address this looming monolith.

Further examination of Debtor's capital structure demands a discussion of the Reserve Escrow.  Debtor's Amended Plan proposes to treat "Allowed Secured Claims of Mechanic's Lien Holders" in Class 3 ("*Class 3 Claims*").[305]   The Amended Plan proposes to satisfy Class 3 Claims in equal monthly payments over 12 months, and "[t]hese claims shall be paid from the Replacement Reserve held by Wilmington Trust, N.A."[306]   As of February 6, 2020, there is a total amount of $1,131,720.90 in the Reserve Escrow accounts.[307]   The Court recognizes amounts in the Reserve Escrow are significant and would greatly assist Debtor in its plan to reorganize and pay expenses.  However, as  previously discussed, Debtor may not withdraw funds from the Reserve Escrow without first curing its Events of Default under the Loan Agreement.[308]   While access to the funds is not outside the realm of possibility should Debtor cure the defaults, Debtor does not currently have a right to receive disbursements from the Reserve Escrow.

Debtor addressed this issue in its post-trial briefing to the Court.  Debtor asserts that since the amount owed under the Class 3 Claims has decreased from $782,387.00 to approximately $70,000.00, it proposes to pay Class 3 Claims in equal payments over 12 months.[309]   Although

---

[303] Wilmington Trust Ex. 12.
[304] ECF No. 160.
[305] *See* ECF No. 88.
[306] *See id.*
[307] ECF No. 153.
[308] *See* Wilmington Trust Ex. 12, Loan Agreement §§ 9.7, 9.8.
[309] ECF No. 158.

Mr. Testa and Mr. Grimes testified as to which liens remain on the Property and the remaining amount of the liens, Debtor failed to explain how, when, or why it paid its pre-petition Class 3 claimants outside of its proposed plan of reorganization.[310]  While the decreased amount of Class 3 Claims support feasibility, the lack of access to Reserve Escrow weighs against feasibility of confirmation of the Amended Plan.  Accordingly, the uncertainty regarding the aspects of Debtor's capital structure and any payment of its pre-petition creditors outside a court approved plan of reorganization at this point weigh against the Amended Plan's feasibility.  Next, the Court turns to the earning power of Debtor's primary asset, the Property.

### ii.  *Earning Power of the Business*

In assessing the earning power of the business, the financial realities of the debtor should be reasonably in alignment with the debtor's projections under the proposed plan.  One way to assess the reliability and soundness of a debtor's projections for feasibility is to use the debtor's past performance as proof of its ability to meet its obligations under the proposed plan.[311]  It is difficult to conceive of how a plan is feasible when virtually all the income generated from the property is required to satisfy the debtor's obligations under the plan of reorganization.[312]  As previously held by this Court, the time immediately following bankruptcy can be an indicator of the company's earning power.[313]

Here, Debtor's Amended Plan explains that the "funds necessary for the satisfaction of the creditors' claims shall be generated from Debtor's income from continued operation of the

---

[310] At trial on December 11, 2019, and without providing any specifics, Dr. Testa and Mr. Grimes testified as to the amounts and liens that remained.
[311] *See In re Geijsel*, 480 B.R. at 258 ("the time immediately following bankruptcy will call for fairly specific proof of the company's ability to meet its obligations…").
[312] *In re Lakeside Glob. II, Ltd.*, 116 B.R. 499, 507 (Bankr. S.D. Tex. 1989).
[313] *See In re Star Ambulance Serv., LLC*, 540 B.R. at 266.

business."[314]  In order for the Amended Plan to be feasible, the Debtor's Property must produce income sufficient to meet its monthly operating expenses and proposed chapter 11 plan payment obligations.[315]  At trial, Debtor projected that it will require approximately $227,000.00 per month to meet its expenses and creditor payments under the Plan.[316]  Additionally, the Debtor's financial projections report anticipated revenue of $232,646.75 in Month 1 and $252,646.75 per month by Month 6 and every month thereafter for the duration of the 60-month period under the Amended Plan.[317]  However, Debtor's January 2020 Monthly Operating Report lists revenues for the previous six months as $200,675.00 in July, $230,537.00 in August, $183,245.00 in September, $187,605.00 in October, $175,149.00 in November, and $175,002.00 in December.[318]  As such, Debtor did not once produce revenues high enough to meet the its $232,646.75 projection, meaning that Debtor would have had a shortfall in every month.[319]  Further, Debtor only would have produced enough revenue to meet its approximate $227,000.00 in expenses and creditor payments under the Amended Plan in one month.[320]

Debtor contends that looking at the revenues under the Monthly Operating Report is a misrepresentation of its financial condition because the reports are produced on a non-accrual cash basis.[321]  Debtor asserts that a more accurate reflection of its financial condition is seen

---

[314] ECF No. 88.

[315] *See In re Lakeside Glob. II, Ltd.*, 116 B.R. 499, 507 (Bankr. S.D. Tex. 1989) ("Where the financial realities do not accord with the proponent's projections or where the proposed assumptions are unreasonable, the plan should not be confirmed.").

[316] Debtor's Ex. 13 (Debtor will require $94,000.00 a month just to meet its operating expenses and $136,500.00 a month for the first 4 months, $134,000.00 a month for the next 8 months, and then $128,000.00 a month thereafter to meet its proposed Plan payments for total average of approximately $133,000.00 a month in Plan payments for a combined total of approximately $227,000.00 a month.)

[317] *Id.*

[318] ECF No. 149.

[319] *Id.*

[320] ECF No. 149 (Debtor lists revenues of $200,675.00 in July, $230,537.00 in August, $183,245.00 in September, $187,605.00 in October, $175,149.00 in November, and $175,002.00 in December.).

[321] ECF No. 158; Non-accrual cash accounting method recognizes revenue and expenses only when money is exchanged or changes hands. Accrual accounting method recognizes revenue when it is earned, and expenses when

through its "Cash on Hand" at the end of each month of 2019 as set forth below:

| July | August | September | October | November | December |
|------|--------|-----------|---------|----------|----------|
| $281,546 | $483,037 | $152,657 | $152,657 | $251,771 | $202,568 |

Even if the Court does accept Debtor's argument, the Court finds it concerning that it would still have only met its projections in three of the last six months,[322] and the trend in Debtor's cash on hand is downward.  Similarly, Debtor's projected expenses are questionable. Debtor projects expenses totaling $93,283.50 per month over the life of the plan.[323]  However, Debtor failed to produce evidence demonstrating that its expenses have been lower than $98,798.00 in any given month.[324]  In fact, Debtor's exhibit summarizing the expenses in its monthly operating reports produced at trial do not match the Monthly Operating Statements filed with the Court.[325]

To support its projections, Debtor cites to testimony provided by Rando, Wilmington Trust's expert witness.  Rando testified at trial: "we've projected that the vacant space—all of it—leases up over the coming four years."[326]  However, Debtor uses Rando's testimony out of context.  As an expert, Rando was testifying as to market assumptions in leasing activity, not the specific leasing activity of Debtor.[327]  Rando stated that the projections were made assuming that "they can create value through lease-up" and that an investor or willing buyer "ha[s] to believe

---

they're incurred (but not paid).

[322] Debtor's Cash on Hand in July, August, and November are the only months where Debtor would have been able to meet its anticipated $227,000.00 in expenses or $232,646.75 in projected revenue.

[323] Debtor's Ex. 13, Bates No. 0293 ("Total Expenses").

[324] Debtor's Ex. 9 (Debtor's expenses in October 2019 are listed as $98,798.00).

[325] Debtor's Ex. 9 at trial lists its expenses for October 2019 at $98,798.00, but Debtor's Monthly Operating Report filed to the Court at ECF No. 149 lists operating expenses for the same month at $138,398.00.

[326] 12/11/2019 Hr. 193: 14–15.

[327] *See* 12/11/2019 Hr. 201: 12–19 ("I believe somebody said earlier we assume all tenants that are in place today remain. Well, in the appraisal, I don't, I assume a 70 percent renewal probability and 30 percent of them are lost, so we're different on the revenue projections there.").

that the market will recover at some point." Debtor cannot have it both ways. In the context of valuation, Debtor argued that Rando's testimony and appraisal was inapplicable to Debtor because it did not specifically take into account the Debtor as an owner and its particular expenses, but now the Debtor is attempting to apply those same market assumptions to prop up feasibility.

Accordingly, the aforementioned considerations of Debtor's earning power do not weigh in favor of the Amended Plan's feasibility.

### iii.     Related Matters

In determining the feasibility of a debtor's plan, a court may consider any number of circumstances that may arise in a particular case.[328] Here, Debtor asks the Court to consider the fact that Testa Family Limited Partnership and Dr. Testa, in his individual capacity, have acted as a backstop to Debtor when fluctuations in the operational cashflow of the Debtor required such.[329] In support of its contention, Debtor represents that Don Testa personally contributed $300,000.00 to the Debtor when the Debtor's cashflow came under pressure during the Holloman rent abatement period and the Testa Family Limited Partnership, the 100 percent owner of the Debtor, has paid other expenses when required.[330] However, the Debtor's Amended Plan indicates that the $300,000.00 was not an equity contribution, but a loan from Dr. Testa to the Debtor.[331] Specifically, the Testa Loan is treated in Class 4 of the Amended Plan.[332]

Although not listed in the Amended Plan, Dr. Testa did testify as to his willingness to

---

[328] *In re Geijsel*, 480 B.R. at 259.
[329] ECF No. 154.
[330] 12/11/2019 Hr. 133: 25; 134: 1–6; 134: 21–22; 135: 10–13.
[331] ECF No. 88.
[332] *Id.*

contribute funds required to fund the Debtor's plan.[333]  He testified that he has "seven figures" ready to contribute if necessary.[334]  Mr. Grimes, the Debtor's property manager, when asked if Dr. Testa has indicated a willingness to contribute additional monies when necessary commented: "Yes, he has."[335]  While the Court finds that the testimony at trial is probative and supports feasibility should Dr. Testa have the ability to fund any financial shortfall of the Debtor, it is too speculative at this juncture.  In assessing the feasibility of a Chapter 11 plan, courts do not place evidentiary value on non-binding pledges of financial support from third parties.[336]  As such, testimony and Debtor's contention that the Amended Plan offers a "backstop" alone is insufficient because Dr. Testa is not bound under the terms of the Amended Plan and there is no evidence before this Court of his ability financially to support any shortfalls in the Amended Plan.  The Court finds Dr. Testa's testimony and Debtor's assertion persuasive as it shows some prospect of feasibility, however, the supporting evidence is too scant to be reasonably relied upon without more.

In sum, after evaluating aspects of the Debtor's capital structure, the earning power of the Property, and other related matters, Debtor's ability to fund the Amended Plan poses issues that the Debtor must overcome before a plan may be confirmed.  On its face, Debtor's Amended Plan as filed suffers from deficiencies that are not reconciled with Debtor's projections.[337]  While the

---

[333]  8/12/2019 Hr. 20: 18–24 ("Q: And should need be, do you have the financial resources to make financial contributions to this entity? A: Yes. Q: Okay. Approximately, how much actual liquid cash do you have today, sir, if you needed to contribute to the operations of this business? A: I have seven figures."); 12/11/2019 Hr. 101: 2–7 ("Q: but if you had to, you'd be willing to contribute personal funds. Is that correct? A: Yes. Q: Is that still your position today? A: Yes.").
[334]  *Id.*
[335]  12/11/2019 Hr. 156: 1–3.
[336]  *See In re Save Our Springs (S.O.S.) All., Inc*., 632 F.3d 168, 172–73 (5th Cir. 2011) (emphasis added) (rejecting debtor's assertion that third-party pledges were evidence of a reasonable assurance of success where pledges were not "contracts ... that commit [the donors] to give money in the future;" finding such pledges were too speculative to provide evidence of feasibility).
[337]  As referenced herein, Debtor's projections at Debtor's Ex. 13 anticipate a net income of $252,646.75 per month

Court recognizes that Debtor has made some demonstrations of feasibility, the issues discussed herein must be addressed prior to confirmation of any plan.  The Amended Plan, therefore, does not satisfy the feasibility requirement of § 1129(a)(11) of the Code.  Because Debtor's Amended Plan fails to satisfy the feasibility requirement, the Court need not determine whether the remaining confirmation requirements of § 1129(a) and the cramdown standard of § 1129(b) have been met.   In reaching this conclusion, it is also unnecessary to address the issue of whether the proposed interest rate in the Amended Plan regarding Wilmington Trust's claim is appropriate.

Accordingly, Debtor failed to meet its burden in proving feasibility by a preponderance of the evidence, Wilmington Trust's Objection to Confirmation under § 1129(a)(11) is sustained, and Debtor's Amended Plan is not confirmed.

### Wilmington Trust's Motion for Relief from Stay

Section 362(d) delineates a host of separate grounds upon which a creditor may move a court to lift the automatic stay.[338]   Upon request of a party in interest and after notice and a hearing, a court shall grant relief from the automatic stay where justified under the scenarios outlined under § 362(d)'s subsections.[339]   Here, Wilmington Trust seeks relief from the automatic stay pursuant to §§ 362(d)(1), (d)(2), and (d)(3) in its Motion for Relief.[340]

### 1.   Whether Cause Exists Under § 362(d)(1) to Lift the Automatic Stay

Section 362(d)(1) of the Bankruptcy Code allows relief from stay "for cause, including the lack of adequate protection."[341]   The Bankruptcy Code does not define "cause," leaving

---

by Month 6.  However, the highest reported income in Debtor's January 2020 Monthly Operating report is only $230,537.00 at ECF No. 149.
[338] *In re JCP Properties, Ltd.*, 540 B.R. 596, 613 (Bankr. S.D. Tex. 2015).
[339] *Id.*
[340] ECF No. 24.
[341] 11 U.S.C. § 362(d)(1).

courts to consider whether cause exists on a case-by-case basis.[342]   The Fifth Circuit has recognized cause as "any reason cognizable to the equity power and conscience of the court as constituting an abuse of the bankruptcy process."[343]

Wilmington Trust contends that the Motion for Relief should be granted because "the circumstances of this case raise the specter of bad faith."[344]   The Fifth Circuit has held that an assessment of good faith relies on a "conglomerate of factors rather than on any single datum" and "depends largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities."[345]   Specifically, the Fifth Circuit has outlined the typical recurring patterns associated with bad faith filings: the debtor has one asset; the secured creditors' liens encumber the single asset; there are few to no employees aside from the principals; there is little to no cash flow; there is no source of income to sustain a plan of reorganization or make adequate protection payments; there are typically few to no unsecured creditors; the property has been posted for foreclosure and the debtor has been unsuccessful in defending against foreclosure in state court; and the debtor and the creditor have proceeded to a standstill in state court, and the debtor has been required to post a bond it cannot afford.[346]

In *In re JCP Properties, Ltd.*, this Court applied the Fifth Circuit standard and found that the petition was filed for a bad faith purpose under § 362(d)(1) where the debtor essentially held one asset, significantly failed to maintain post-confirmation payments to the creditor, and attempted to circumvent a prior determination that its property was foreclosed.[347]   This Court

---

[342] *See Matter of Reitnauer*, 152 F.3d 341 (5th Cir. 1998).
[343] *See Matter of Little Creek Dev. Co.*, 779 F.2d 1068, 1072. (5th Cir. 1986) (quoting *In re Victory Const. Co., Inc.*, 9 B.R. 549, 560 (Bankr. C.D. Cal. 1981).
[344] ECF No. 124.
[345] *Matter of Little Creek Dev. Co.*, 779 F.2d at 1072.
[346] *Id.*; *In re JCP Properties, Ltd.*, 540 B.R. at 614.
[347] *In re JCP Properties, Ltd.*, 540 B.R. at 616.

found that the debtor did not act in good faith when it leveraged its promises in a confirmed plan, and thereafter obtained the automatic stay from a second petition when the debtor did not get its way.[348]

Here, it is undisputed that Debtor is a SARE, Wilmington Trust's lien encumbers the Property, and there are few unsecured creditors listed in Debtor's schedules.[349]   However, although disputed by Wilmington Trust, Debtor has made complete payments each month to Wilmington Trust at the non-default rate.[350]   Notwithstanding the non-binding nature of his position, Dr. Testa testified that he is willing to contribute any monies necessary to continue the operation of the Property.[351]   Next, although Debtor filed the Petition soon after the Harris County Suit, there is no evidence demonstrating that Debtor has used the bankruptcy process merely as a means to stall a two-party dispute.[352]   Debtor's Property has not been posted for foreclosure, and the Petition was filed prior to any standstill in the Harris County Suit.  Unlike *In re JCP Properties, Ltd.*, Debtor has not attempted to circumvent a prior ruling.[353]   Debtor has been actively engaged in the bankruptcy process evidenced by three days of testimony at trial and the filing of two plans for reorganization.  The Court recognizes the Debtor's efforts.

As such, the Court does not find that Debtor's Petition was filed in bad faith and thus cause does not exist to lift the stay pursuant to § 362(d)(1).

## 2.   Whether Debtor's Property is Necessary for an Effective Reorganization Under § 362(d)(2)

---

[348] *Id.*
[349] *See* ECF No. 34.
[350] 12/11/2019 Hr. 55: 18–24 ("Q: And prior to the filing of the bankruptcy had the Debtor made each of its required monthly payments . . . [t]hey were paying the contract rate? A: Yeah.").
[351] 8/12/2019 Hr. 20–21.
[352] See ECF No. 153.
[353] *See In re JCP Properties, Ltd.*, 540 B.R. at 616.

Section 362(d)(2) of the Bankruptcy Code allows relief from the automatic stay with respect to property if two elements are satisfied: (i) the debtor has no equity in the property, and (ii) such property is not necessary to an effective reorganization.[354]   Showing that collateral is necessary to an effective reorganization requires demonstrating both that the property is needed for a potential reorganization and that there can be an effective reorganization in the sense that there is "a reasonable possibility of a successful reorganization within a reasonable time."[355]   The moving creditor has the initial burden of establishing a lack of equity in property and the debtor has the ultimate burden of establishing that property is necessary for an effective reorganization.[356]   Here, the Court has already found that Wilmington Trust has an allowable claim against Debtor in an amount not to exceed $15,060,084.74[357] and that the value of the Property is $13,200,000.00.   Because the final allowable amount of Wilmington Trust's claim is to be determined after Wilmington Trust has filed its amended proof of claim in accordance with this Court's order, the Court need not determine at this time whether Debtor has equity in the Property for the purposes of § 362(d)(2).

Nevertheless, the Property is undoubtedly needed for an effective reorganization.   In *In re Omni Lion's Run, L.P.*, the court found that the debtor's properties were necessary for a reorganization where the properties were income-producing and the only meaningful assets of the estate.[358]   Here, the Property is income-producing and given Debtor's SARE status, the Property is Debtor's only asset.   Accordingly, like the debtor in *In re Omni Lion's Run, L.P.*,

---

[354] 11 U.S.C. § 363(d)(2).

[355] *In re JCP Properties, Ltd.*, 540 B.R. at 617; *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375–76, (1988).

[356] *Matter of Canal Place Ltd. P'ship*, 921 F.2d 569 (5th Cir. 1991); *See* 11 U.S.C. § 362(g).

[357] *Id.*; The final allowable amount of Wilmington Trust's Proof of Claim is to be determined for the reasons discussed herein.

[358] *In re Omni Lion's Run, L.P.*, 578 B.R. 394, 400 (Bankr. W.D. Tex. 2017).

there is no reorganization without the Property thereby rendering it necessary for an effective reorganization.   The final remaining question now is whether there can be an effective reorganization in the sense that there is "a reasonable possibility of a successful reorganization within a reasonable time."[359]  The Fifth Circuit in *Canal Place* explained that "[t]he reference to an 'effective' reorganization should require relief from the automatic stay if there is no reasonable likelihood of reorganization due to creditor dissent or feasibility considerations."[360]

As explained herein, Debtor's Amended Plan, as filed, may not be confirmed due to lack of feasibility.  However, that is not to say that confirmation is outside the realm of possibility. Pursuant to § 362(d)(2), the Court finds that there is a reasonable possibility of success *within a reasonable amount of time*, because the Debtor could file a modified plan that would address this Court's concerns.[361]   A modified plan, however, must be submitted soon in order to protect Wilmington Trust's rights and prevent any undue prejudice; otherwise, the Debtor will have failed to carry its burden to show that an effective reorganization may be accomplished in a reasonable period of time.[362]

Accordingly, the Court finds that the automatic stay will remain in place conditioned upon the Debtor's filing of a modified plan within forty five (45) calendar days from entry of this Court's Memorandum Opinion and Order on the Court's docket that addresses the Court's feasibility concerns discussed herein and takes into account treatment of Wilmington Trust's claim.[363]  Failure of Debtor to file a modified plan as set forth herein will constitute cause for this

---

[359] *In re JCP Properties, Ltd.*, 540 B.R. at 617.

[360] *Matter of Canal Place Ltd. P'ship*, 921 F.2d at 576.

[361] *See In re Couture Hotel Corp.*, 536 B.R. 712, 755 (Bankr. N.D. Tex. 2015) ("As explained herein, the Plan, as drafted, may not be confirmed. But, with a few modifications, the Debtor could file a new plan that would address this Court's concerns (an "Amended Plan"), and the current Plan's projections clearly show that the Dallas Hotel would be necessary for an effective reorganization…").

[362] *See id.*

[363] 11 U.S.C. § 1127(a).

Court to set a further evidentiary hearing on Wilmington Trust's Motion For Relief pursuant to 11 U.S.C. § 362(d)(2).

### 3.   Whether Debtor Commenced Payments Under § 362(d)(3)

Code § 101(51B) defines single asset real estate as "real property constituting a single property or project, other than residential real property with fewer than 4 residential units, which generates substantially all of the gross income of a debtor who is not a family farmer and on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental thereto."[364]

Under § 362(d)(3), in a single asset real estate case, the court shall grant relief from the automatic stay in favor of a moving secured creditor, unless, not later than 90 days after the entry of the order for relief (or such other later date as the court may determine, for cause within the 90–day period) or 30 days after the court determines that the debtor is subject to Code § 362(d)(3), whichever is later, either:

(A) the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; *or*

(B) the debtor has commenced monthly payments that:

> (i)      may, in the debtor's sole discretion, notwithstanding Code § 363(c)(2), be made from rents or other income generated before, on or after the date of the commencement of the case by or from the property to each creditor whose claim is secured by such real estate (other than judgment liens or unmatured statutory liens), and

> (ii)      are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in real estate.[365]

---

[364] 11 U.S.C. § 101(51B).
[365] 11 U.S.C. § 362(d)(3) (emphasis added).

Here, Debtor's case was filed as a SARE, so § 362(d)(3) applies.[366]  The provisions of § 362(d)(3) are separated by the word "or" and thus are read disjunctively.[367]  Here, Debtor was given until May 27, 2019, to file its plan of reorganization.[368]  On April 23, 2019, Debtor filed its initial plan of reorganization well within the prescribed time limit, and thereafter filed an amended plan of reorganization on June 13, 2019, which is the current plan before the Court.[369]  Nevertheless, Debtor commenced monthly payments within 90 days after the entry of the order for relief in an amount equal to interest at the nondefault contract rate to Wilmington Trust with income generated from the Property.[370]  Accordingly, the Court finds no basis for granting relief from the automatic stay pursuant to § 362(d)(3) and thus such relief is denied.

## III.   CONCLUSION

Pending before the Court is Northbelt's Claim Objection,[371] Wilmington Trust's Motion for Relief,[372] and Northbelt's Amended Plan.[373]  The Court conducted an initial hearing on confirmation of the Amended Plan and the Claim Objection on August 12, 2019, conducted further hearings on all three matters in an omnibus fashion on December 11, 2019, and concluded the hearings on January 16, 2020.  After considering the pleadings on file, arguments of counsel, credibility of witnesses, applicable law and all other evidence in the record and for the reasons set forth in this Court's Memorandum Opinion, the Court holds that:

1. Debtor's Claim Objection is SUSTAINED in part and DENIED in part. Wilmington Trust shall have an Allowed Claim in the amount not to exceed $15,060,084.74 subject to Wilmington Trust's filing of an amended proof of

---

[366] ECF No. 1.
[367] *Id.*
[368] ECF No. 36.
[369] ECF No. 88.
[370] Debtor's Ex. 9; ECF No. 1.
[371] ECF No. 99.
[372] ECF No. 125.
[373] ECF No. 88, 96.

claim in accordance with this Courts' order.  The Court's rulings regarding Debtor's specific objections are as follows:

a. Debtor's Objection to the principal balance in the amount of $12,632,574.14 is OVERRULED.  The principal balance in the amount of $12,632,574.14 is ALLOWED;

b. Debtor's Objection to Interest in the amount of $54,781.86 is SUSTAINED. Interest in the amount of $54,781.86 is DISALLOWED;

c. Debtor's objection, to the extent it seeks disallowance of Wilmington Trust's entire claim for Default Interest in the amount of $796,961.02 is OVERRULLED. Wilmington Trust shall have an allowed claim for Default Interest pursuant to § 502(a). Debtor's Objection as it pertains to any Default Interest claimed by Wilmington Trust prior to May 17, 2018 is SUSTAINED. Within fourteen (14) calendar days from entry of this Court's Memorandum Opinion and Order on the Court's docket Wilmington Trust must amend its proof of claim to reflect the amount and calculation of Default Interest accrued after May 17, 2018, through the Petition Date. Failure of Wilmington Trust to amend its claim in accordance with this Court's Order will result in the disallowance of the entire $796,961.02 in Default Interest without further order of this Court

d. Debtor's Objection to Late Charges in the amount of $5,144.18 is OVERRULED. The amount of $5,144.18 in Late Charges is ALLOWED;

e. Debtor's objection, to the extent it seeks disallowance of Wilmington Trust's entire claim to Default Prepayment Premium in the amount of $1,612,354.00, is OVERRULED. Wilmington Trust shall have an allowed claim for Default Prepayment Premium beginning December 18, 2018, pursuant to § 502(a).  Debtor's objection as it pertains to the amount and calculation of the Default Prepayment Premium that should be allowed is SUSTAINED. Within fourteen (14) calendar days from entry of this Court's Memorandum Opinion and Order on the Court's docket Wilmington Trust must amend its proof of claim to reflect the amount of Default Prepayment Premium and detail how it was calculated.  Failure of Wilmington Trust to amend its claim in accordance with this Court's Order will result in the disallowance of the entire $1,612,354.00 in Default Prepayment Payment without further order of this Court.

f. Debtor's Objection to Special Servicing Fees in the amount of $12,051.40 is OVERRULED. Special Servicing Fees in the amount of $12,051.40 is ALLOWED;

g. Debtor's Objection to a Payoff Fee in the amount of $1,000.00 is OVERRULED. The Payoff Fee in the amount of $1,000.00 is ALLOWED;

h. Debtor's Objection to Property Protection Advances in the amount of $25,165.06 is SUSTAINED. Property Protection Advances in the amount of $25,165.06 is DISALLOWED;

i. Debtor's Objection to Force Placed Insurance in the amount of $1,142.96 is SUSTAINED. Force Placed Insurance in the amount of $1,142.96 DISALLOWED;

j. Debtor's Objection to Legal Fees in the amount of $92,615.50 is SUSTAINED. Legal Fees in the amount of $92,615.50 is DISALLOWED;

k. Debtor's Objection to Interest on Advances in the amount of $122.44 is SUSTAINED. Interest on Advances in the amount of $122.44 is DISALLOWED; and

l. Debtor's Objection to a Liquidation Fee in the amount of $151,412.97 is SUSTAINED. Liquidation Fee in the amount of $151,412.97 is DISALLOWED.

2. Wilmington Trust's Objection to Confirmation pursuant to § 1129(a)(3) is OVERRULED.

3. Wilmington Trust's Objection to Confirmation pursuant to § 1129(a)(11) is SUSTAINED. Debtor's Amended Plan is NOT CONFIRMED.

4. Wilmington Trust's Motion for Relief pursuant to 11 U.S.C. §§ 362(d)(1) and (d)(3) is DENIED.

5. Wilmington Trust's Motion for Relief pursuant to 11 U.S.C. § 362(d)(2) is DENIED, but conditioned upon the Debtor's filing of a modified plan within forty-five (45) calendar days from entry of this Court's Memorandum Opinion and Order on the Court's docket that addresses the Court's feasibility concerns discussed herein and takes into account treatment of Wilmington Trust's claim. Failure of Debtor to file a modified plan as set forth herein will constitute cause for this Court to set a further evidentiary hearing on Wilmington Trust's Motion For Relief pursuant to 11 U.S.C. § 362(d)(2).

An Order consistent with this Memorandum Opinion will be entered on the docket simultaneously herewith.

SIGNED 05/29/2020.

Eduardo V. Rodriguez
United States Bankruptcy Judge